ROBERT R. POWELL, SBN 159747
SARAH E. MARINHO, SBN 293690
**POWELL & ASSOCIATES**
925 W. Hedding Street
San Jose, CA 95126
T: (408) 553-0201
F: (408) 553-0203
E: admin@rrpassociates.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(San Jose Division)

| | |
|---|---|
| LUCINDA LOZANO and JOHNNY LOZANO, SR., individually and as heirs to JOHNNY LOZANO, JR, deceased, and the ESTATE OF JOHNNY LOZANO, JR. <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SANTA CLARA; LAURIE SMITH, in her individual and official capacity; TROY BELIVEAU, in his individual and official capacity; ALEXANDER CHYORNY, in his individual and official capacity; KRISTIN WALSH, JEFFREY NEKOMOTO, SEAN KANAKARAJ, SUSAN ZHAO and DOES 1-100, <br><br> Defendants. | Case No. 19-cv-02634 <br><br> **COMPLAINT FOR DAMAGES:** <br><br> 1. Failure to Provide Medical Care (Fourteenth Amendment); <br> 2. Failure to Protect from Harm (Fourteenth Amendment) <br> 3. Deprivation of Substantive Due Process (First and Fourteenth Amendments); <br> 4. Failure to Furnish Medical Care; <br> 5. Neglient Supervision, Training, Hiring, Retention; <br> 6. Wrongful Death; <br> 7. Negligence. <br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.     Plaintiffs Lucinda Lozano and Johnny Lozano, Sr., individually and as heir to Johnny

Lozano, Jr., deceased, and the Estate of Johnny Lozano, Jr., file this complaint for violation of

1

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

civil rights after Johnny Lozano, Jr. was denied constitutionally adequate medical care by correctional medical staff and Valley Medical Center employees who were deliberately indifferent to his chronic medical needs, resulting in his tortuous and untimely death.

2.     Defendant County of Santa Clara, including its Sheriff's Office and Valley Medical Center, were aware from the time that Johnny Lozano, Jr. was booked and for the years that followed, that he had a chronic heart condition and needed ongoing treatment for congestive heart failure while in the jail.  Throughout his incarceration, Johnny reminded medical staff that he needed his vitals monitored regularly and constantly updated County nurses and doctors with his symptoms and status.  Notwithstanding the knowledge that Johnny presented a condition that required closely monitored medical attention, Johnny was not immediately placed in a medical unit, or provided required medical attention.  Santa Clara County had in place substandard policies and practices for identifying and treating prisoners with serious health conditions.  Johnny's tragic death should not have happened – and would not have happened – if Defendants had fulfilled their duties as public safety and health care agencies and had in place policies and procedures that are standard in their fields and required by law.

3.     County of Santa Clara Sheriff's Office and Valley Medical Center have a policy and practice of failing to provide long-term treatment plans to prisoners in the hope that they will be transferred to state prison, released, or otherwise no longer be the County's problem.  Jail medical staff regularly inquire of prisoners about their criminal case and when they think they will be transferred or released.  Due to this County policy and practice, Valley Medical Center doctors delayed getting Johnny Lozano, Jr. timely medical treatment for his chronic condition and denied him access to a life-saving organ transplant or medical device implantation because the jail was an unfit place for him to recover.  Johnny Lozano, Jr. died in County

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

custody due to these constitutionally deficient policies, his death the manifestation of complete deliberate indifference to his care, and his life.

## JURISDICTION

4.      This Complaint seeks damages for violation of the civil rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1376, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## VENUE

7.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because the unlawful acts, practices and omissions giving rise to the claims brought by Plaintiff occurred in the County of Santa Clara, which is within this judicial district.

8.      Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorize assignment to this division because all or a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Santa Clara County, which is served by this division.

## PARTIES

9.      Plaintiffs LUCINDA LOZANO and JOHNNY LOZANO, SR., were at all times mentioned herein, the parents of Johnny Lozano, Jr., a pretrial detainee in the Santa Clara jails in the custody of Defendant Santa Clara County.  Mr. and Mrs. Lozano are the heirs to the ESTATE OF JOHNNY LOZANO and bring this action pursuant to California Code of Civil

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

Procedure §§ 377.10 *et seq.*  Plaintiffs' son, Johnny Lozano, Jr. was arrested and booked into

jail on August 7, 2013, and entered pleas of not guilty at his arraignment.  Johnny Lozano, Jr.

remained in the custody of Santa Clara County Sheriff's Office as a pretrial detainee until he

died on May 8, 2018.  The survival causes of action in this matter are based on violations of

Johnny Lozano, Jr's rights under the First and Fourteenth Amendments, and on violations of

California state law.  The parents are also suing individually for violations of civil rights

under the First and Fourteenth Amendments and California state law.

10.    Defendant COUNTY OF SANTA CLARA (hereinafter "COUNTY") is a public entity,

duly organized and existing under the laws of the State of California.  Under its authority,

Defendant County of Santa Clara operates and manages Santa Clara County Department of

Corrections ("DOC") and is and was at all relevant times mentioned herein responsible for the

actions and/or inactions and the policies, procedures, and practices/customs of the Santa Clara

County Sheriff's Office, County jail facilities, the on-site jail medical provider Adult Custody

Health Services ("ACHS"), and each entity's respective employees and/or agents.  COUNTY

also maintains a hospital, Valley Medical Center ("VMC"), and frequently takes prisoners

there for medical treatment and is and was at all relevant times mentioned herein responsible

for the actions and/or inactions and the policies, procedures, and practices/customs of VMC.

COUNTY is responsible for ensuring that jail policies and practices do not violate prisoners'

substantive and procedural due process rights and is and was responsible for ensuring the

provision of emergency and medical services to all Santa Clara County prisoners.

11.    At all times mentioned herein, Defendant LAURIE SMITH was employed as the

elected Sheriff for defendant COUNTY, the highest position in the Santa Clara County

Sheriff's Office.  As Sheriff, Defendant Smith is and was responsible for the hiring,

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

screening, training, retention, supervision, discipline, counseling, and control of all Santa Clara County Sheriff's Office custodial employees and/or agents and Does 1-100.  Defendant Smith is and was charged by law with the administration of the Santa Clara County jail. Defendant Smith also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Santa Clara County Sheriff's Office alleged herein were committed.  Defendant Smith is sued in her individual and official capacities.

12.    At all times mentioned herein, Defendant TROY BELIVEAU was employed as the Assistant Sheriff for defendant County of Santa Clara.  As Assistant Sheriff, Defendant Beliveau is and was second in command to Defendant Smith and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Santa Clara County Sheriff's Office custodial employees and/or agents and Does 1-100. Defendant Beliveau is and was charged by law with the administration of the Santa Clara County jail.  Defendant Beliveau also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Santa Clara County Sheriff's Office alleged herein were committed.  Defendant Beliveau is sued in his individual and official capacities.

13.    At all times mentioned herein, Defendant ALEXANDER CHYORNY was employed as a physician for defendant COUNTY and the Director of the on-site jail medical provider, Adult Custody Health Services ("ACHS").  Defendant Chyorny is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all ACHS employees and/or agents and Does 1-100.   Defendant Chyorny also is and was responsible in whole or in part for the promulgation of the policies and procedures and

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

allowance of the practices/customs pursuant to which the acts and omissions of the jail medical staff alleged herein were committed.  Defendant Chyorny is sued in his individual and official capacities.

14.     At all times mentioned herein, Defendant KRISTIN WALSH was employed as a physician for defendant County in its on-site jail medical provider, Adult Custody Health Services.  According to Johnny Lozano, Jr.'s medical records and investigative reports regarding his death, Defendant Walsh was one of the persons charged with Johnny's medical care while he was in the custody of officials at the Santa Clara County jail.  Defendant Walsh ignored and/or did not believe Johnny's complaints and brushed off his concerns as mental health problems or "trial anxiety."  Rather than treat Johnny's visible bloating and numerous other red flags as serious symptoms requiring medical attention, Walsh left Johnny in his cell without providing him emergency medical attention until it was far too late.

15.     At all times mentioned herein, Defendant JEFFREY NEKOMOTO was employed as a physician for defendant County in its on-site jail medical provider, Adult Custody Health Services.  According to Johnny Lozano, Jr.'s medical records and investigative reports regarding his death, Defendant Nekomoto was one of the persons charged with Johnny's medical care while he was in the custody of officials at the Santa Clara County jail. Defendant Nekomoto ignored and/or did not believe Johnny's complaints and brushed off his concerns as mental health problems or "trial anxiety."  Rather than treat Johnny's visible bloating and numerous other red flags as serious symptoms requiring medical attention, Nekomoto left Johnny in his cell without providing him emergency medical attention until it was far too late.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

16.   At all times mentioned herein, Defendant SEAN KANAKARAJ was employed as a physician for defendant County in its on-site jail medical provider, Adult Custody Health Services.  According to Johnny Lozano, Jr.'s medical records and investigative reports regarding his death, Defendant Kanakaraj was one of the persons charged with Johnny's medical care while he was in the custody of officials at the Santa Clara County jail. Defendant Kanakaraj ignored and/or did not believe Johnny's complaints and brushed off his concerns as mental health problems or "trial anxiety."  Rather than treat Johnny's visible bloating and numerous other red flags as serious symptoms requiring medical attention, Kanakaraj left Johnny in his cell without providing him emergency medical attention until it was far too late.

17.   At all times mentioned herein, Defendant SUSAN ZHAO was employed as a physician for defendant County in its hospital, Valley Medical Center (VMC).  According to Johnny Lozano, Jr.'s medical records and investigative reports regarding his death, Defendant Zhao was one of the persons charged with Johnny's medical care while he was hospitalized at VMC.  Defendant Zhao unilaterally denied Johnny Lozano, Jr.'s chance at being evaluated by Stanford doctors after a referral from her colleague Dr. Brewster who determined that Johnny could benefit from an implanted device or organ transplant, thereby interfering with critical medical intervention that could have saved Johnny's life.

18.   At all times mentioned herein, Defendant DOE 1 was employed as a nurse for defendant County in its on-site jail medical provider, Adult Custody Health Services. According to Johnny Lozano, Jr.'s medical records and investigative reports regarding his death, Defendant DOE 1 was one of the persons charged with Johnny's medical care while he was in the custody of officials at the Santa Clara County jail.  Defendant DOE 1 ignored

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

and/or did not believe Johnny's complaints and brushed off his concerns as mental health problems or "trial anxiety."  Rather than treat Johnny's visible bloating and other red flags as serious symptoms requiring medical attention, DOE 1 left Johnny in his cell without providing him emergency medical attention until it was too late.

19.    The true names and identities of Defendants DOES 2 through 100 are presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants Does 2 through 100 are custody and/or medical staff at Santa Clara County jail who were responsible for ensuring Johnny Lozano, Jr.'s safety and providing adequate health treatment.  Plaintiffs allege that each of Defendants Does 2 through 100 was deliberately indifferent to Johnny's medical needs and safety, failed to provide reasonably necessary medical care to him, violate his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other defendants to engage in such conduct.

20.    Plaintiffs further allege that Defendants Does 2 through 100 violated Plaintiffs' First and Fourteenth Amendment rights and rights under California state law.

21.    Plaintiffs further allege that each of the Defendants Does 2 through 100 was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of medical, mental health, and jail custody employees and/or agents involved in the conduct alleged herein.

22.    Plaintiffs will seek to amend this Complaint as soon as the true names and identities of Defendants Does 1 through 100 have been ascertained.

## EXHAUSTION OF PRE-LAWSUIT PROCEDURES
## FOR STATE LAW CLAIMS

23.    All Plaintiffs timely filed governmental tort claims with Defendant County of Santa Clara including on behalf of the Estate of Johnny Lozano, Jr., on November 7, 2018.  This

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

claim included notice to County, VMC, and Drs. Chyorny, Walsh and Nekomoto of Plaintiffs' intention to file suit against them based on their negligence in providing professional health care services.

24.    By letter on December 14, 2018, the County of Santa Clara rejected the government tort claim filed by Plaintiffs.

## FACTUAL ALLEGATIONS

**Jail Medical Staff was Aware that Johnny Lozano, Jr. had Congestive Heart Failure but Failed to Properly Treat his Condition or Take Him to a Specialist Regularly**

25.    From August 7, 2013 until his death on May 8, 2018, Johnny Lozano, Jr. was a pretrial detainee in the custody of the Santa Clara County Sheriff's Office, and was presumed innocent.

26.    Johnny was 23 when he was arrested and 28 when he died, spending almost five years in Santa Clara County jail under the care of its medical staff.

27.    Johnny came into the jail with Class I heart failure, the least severe form of heart failure, and manageable condition with the right lifestyle and supportive medical care with routine monitoring.

28.    On the jail's watch this progressed to Class IV heart failure, culminating in Johnny's needless suffering for several years and leading to his unnecessarily early death.

29.    Johnny was born with a heart condition and informed the jail at intake that he had a cardiac pacemaker.

30.    The jail medical staff, including Drs. CHYORNY, WALSH, KANAKARAJ and NEKOMOTO were aware that Johnny was diagnosed with cardiomyopathy, arrythmia, thrombocytopenia, and other serious conditions.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

31.   Johnny's pacemaker was implanted in 2010 and his condition at the time he was booked into the jail in 2013 required medication and medical care.

32.   Instead of regularly taking Johnny to doctor's appointments with a specialist, the jail medical staff just waited until he was symptomatic and then would send him to the emergency room where VMC doctors would temporarily stabilize him only to return him to jail with no treatment plan to address his underlying medical issues.

33.   COUNTY medical staff were indifferent to his medical needs since he was a prisoner detained on homicide charges.  A nurse dismissed Johnny's complaints of pain and discomfort as "trial anxiety," and told him she would refer him to mental health services.

34.   Three weeks after Johnny's death his co-defendants were acquitted of homicide.

**Johnny Lozano, Jr.'s Medical Needs Ignored for Years Despite His Own Advocacy for Better Treatment**

35.   Despite his repeated requests and obvious medical need, the jail staff refused to house Johnny in the medical unit where he could receive more frequent and devoted medical attention.

36.   The jail medical staff, including Chyorny, Walsh, Nekomoto and Kanakaraj, would dismiss Johnny's symptoms until they became acute and required emergency treatment. COUNTY, through ACHS (jail medical) and VMC, failed to develop a treatment plan for Johnny, but rather just brought him to the VMC ER to be temporarily stabilized then returned to jail as his condition noticeably worsened.

37.   On October 25, 2016, after over three years in County custody with subpar medical treatment, Johnny was taken by ambulance to VMC after multiple fainting episodes, including at least one time where he hit his head on the floor after fainting.  Johnny had reported feeling lightheaded and medical staff noticed his lips were bluish in color.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

38.   CHYORNY, WALSH and KANAKARAJ were aware of Johnny's serious medical condition at this point and were his treating physicians at various times during his incarceration, including the two years prior to his death.

39.   While at VMC during the late October hospitalization, the battery in his pace maker implanted device was found to be at 3%.   Johnny had surgery to have the batteries in his pace maker replaced and at discharge he was informed as was jail medical including KANAKARAJ that he should return to the Device Clinic in 3 months for a follow up. Despite this clear recommendation by the cardiologist, the jail medical staff did not arrange for Johnny to be seen at the Device Clinic until May 2017.

40.   This pattern of deliberate indifference to Johnny's medical needs would continue until his death.

41.   On November 10, 2016, Johnny wrote a request to jail medical to get his vitals checked weekly.  When Nurse Amy Flores spoke to Johnny about his request, Johnny further reported that the doctor said he should be getting his vitals checked weekly.  Nurse Flores took his blood pressure but did not take check his body temperature, pulse, or breathing rate, or arrange for weekly vital signs checks, writing in her notes that the doctor did not order it and that Johnny was "mad."

42.   The jail medical staff failed to check Johnny's vital signs weekly.  They would often go weeks without taking his vitals, whereas other times they would attempt to do a blood draw only two days after they last drew Johnny's blood, resulting in him requesting that they come back at a more reasonable interval.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

43.   On December 19, 2016, Johnny was presented with a refusal form to sign saying that he refused his medical appointment.  Since Johnny did not refuse the appointment, he wrote on the form "I did not refuse my appointment," and asked to reschedule.

44.   The jail medical staff has a practice of cancelling medical appointments without notifying the patients and falsely documenting the reason for the cancellation as being that the patient refused the visit.  Either medical or correction staff then presents the prisoner with a refusal form to sign, pursuant to policy.

45.   Due to the cancellation of Johnny's December 19 appointment, the jail rescheduled him for another appointment in February of the next year.

46.   Jail medical staff regularly have inadequate response times to patient medical needs and set appointments out as many as three months due to understaffing and deliberate indifference to the patients' medical needs.  These delays often include patient requests for pain management.

47.   Johnny was taken to the VMC ER on March 6, 2017 with cardiopulmonary symptoms and reports of dizziness.  He was discharged March 7, 2017, but then complained of dizziness again the next day.

48.   He was readmitted to VMC on March 9, 2017 when he reported to the jail medical staff including WALSH that "it feels like my heart is getting heavier and struggling to beat," and he complained of vertigo.

49.   While at the hospital, despite two correctional deputies being assigned to guard him in his hospital room, the policies of BELIVEAU and SMITH required that Johnny be shackled to the hospital bed for his entire stay.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

50.     At this point Johnny had been in COUNTY custody for years with no disciplinary issues at the jail that made him a security threat.  The restrictive shackling while Johnny was seriously ill in the hospital and did not pose an escape risk was due to him being a homicide defendant, despite him being presumed innocent under the law.

51.     Having his arm at an unnatural angle in order to accommodate the unnecessary restraints for five full days caused Johnny pain that lasted after he was discharged from VMC. The VMC doctors prescribed him Norco for the pain after examining his arm.

52.     Johnny returned to the jail March 14, 2017.  His left arm hurt so much that at night he had trouble sleeping, but KANAKARAJ refused to dispense the pain medication prescribed by the VMC doctor despite the fact that he still had visible swelling on his left hand.

53.     On March 15, Johnny wrote a request to jail medical staff for pain management, saying "My pain is extreme in my arm.  My arm was messed up in the hospital.  The hospital prescribed me Norco and the jail doctor has belittled my problem and has gave me Tylenol. This always happens and I'm tired of it.  The jail hasn't even seen my problem."  The nurse referred the request to WALSH.

54.     On March 16, Johnny reported to Nurse Marilyn Jacinto and KANAKARAJ that he was feeling dizzy.

55.     In an encounter on March 28, 2017, jail medical Dr. Jeffrey Nekomoto examined Johnny and discussed his heart issues including his frequent dizzy spells.  Nekomoto inquired as to the status of Johnny's criminal case and if he had a release date.  Nekomoto wrote in his notes that "initially patient was very aggressive, litigious in character and irritable.  After spending a lot of time with him explaining and answering all his questions, he was more calm in the end, and left being appreciative of my help."

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

56.   On April 15, 2017, jail medical refused to bring Johnny's medication to him when he was too ill to get up to go to "pill call," the term used by the jail for when the nurse comes to the common area of the housing unit with a cart and dispenses medication to the prisoners who must stand in line.  Johnny let the deputy know that he wanted his medication.  WALSH was made aware of this but made no effort to accommodate Johnny receiving medication at his cell or by moving Johnny to the medical unit.

57.   On May 1, 2017, Johnny was seen at the VMC Cardiology Clinic.  The doctor there, Thomas Wentzien, referred Johnny to the Device Clinic to check on his pacemaker, and recommended that he return to the Cardiology Clinic in two to three months and have his labs taken in 60 days.  This information was given to Dr. Chyorny and Dr. Kanakaraj at jail medical.

58.   On June 12, 2017, nurse Harpreet Kaur called to 7A for a "stat lab draw" ordered by WALSH but Johnny was in court.  Nurse Kaur left notes in the charge nurse report to follow up when Johnny is back from court.

59.   On June 16, 2017, Nurse Stephanie Hopkins tried to administer Amiodarone to Johnny but Johnny informed her that the doctor told him that the Amiodarone would be discontinued. The nurse checked HealthLink and the medication was still active so the nurse sent a message to the doctor for clarification.

60.   By July 14, 2017, Johnny still had not had his labs done, and Nurse Rosete got a call from the lab stating that they had received a requisition for Johnny but no specimen.  Nurse Rosete put a note in her report to pass down to the night nurse to schedule a blood draw for July 15.  July 15 came and went, and Johnny still did not have his blood drawn.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

61.    In August of 2017 Johnny was getting frustrated at the lack of treatment for his illness and wondered if it was because he was not housed in the medical unit.  He put in multiple requests to be moved from 7A to the medical unit where he thought he would be treated like a person with a serious medical condition, rather than warehoused and ignored and treated like a complainer whenever he needed medical attention.

62.    On October 22, 2017, Johnny reported feeling dizzy and was seen by jail medical. Although his blood pressure was high (132/72), Nurse Amy Flores did not let him see a doctor or even consult with a doctor herself, she just gave him some water and returned him to his cell.

63.    The next day, October 23, 2017, Johnny again told jail medical that he was not feeling well, and that he has been having a high pulse on and off for three days.  Nurse Julita Petrola took his vitals and confirmed that he still had high blood pressure (132/72).

64.    Johnny was taken to VMC that evening and returned to the jail two days later on October 25.  Despite his serious medical condition and the need for frequent monitoring of his symptoms, the jail housed him in general population and not in the medical unit.

65.    While at VMC, Johnny had a transthoracic echocardiogram (TTE) which showed a decrease in his heart's ejection fraction (EF) compared with one year prior.

66.    EF refers to how well one's left ventricle pumps blood with each heartbeat.  Johnny's EF was now at 25-30%, whereas it had been 30-35% in 2016.

67.    Lab results from blood drawn on October 24, 2017 show abnormally high levels of aspartate aminotransferase (AST) and high bilirubin levels which can each point to liver disease.  Lab results from blood taken October 25, 2017 showed that Johnny had low white

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

blood cell count and low platelet count.  He also had low levels of $CO_2$ in his blood which can be a sign of kidney disease.

68.    On October 29, Johnny reported that his back "hurts a lot" in the top right center of his back and into his right shoulder blade and described the pain as feeling like a pulled muscle. Despite unexplained aches and pains in the back or shoulders being a sign of heart disease, the nurse did not let Johnny see a doctor and just offered him Tylenol.

69.    On the evening of October 31, Johnny reported to jail medical staff that his pain was constant, severe and rapidly worsening.  He reported that the Tylenol did not provide relief, the symptoms are aggravated with any movement, and that he has been sleeping poorly.

70.    The next morning around 5:00am he repeated his concerns to the same nurse.

71.    Later that same morning of November 1, 2017, Johnny told Nurse Kaur that he did not feel well and was nauseous.  He was brought to jail medical by wheelchair and seen by WALSH.  He reported having diarrhea five times per day along with nausea and vomiting since the previous day, as well as heart palpitations and shoulder pain.

72.    Nurse Rosete conveyed to WALSH that Johnny stated that his chest was on fire, but WALSH was indifferent to her congestive heart-failure patient's medical needs and instead ordered him some Mylanta.

73.    WALSH wrote in her notes regarding the November 1 encounter that "He has been using tylenol but feels it is not helping at all, has been unable to sleep due to the pain, and is very upset that no one is doing anything and is demanding medication for it."  WALSH called Johnny "persistent and arguing demanding stronger pain meds to help him sleep."  WALSH dismissed his pain and requests for stronger pain relief and "counseled" him to stretch and use Bengay, saying he could follow up with Dr. KANAKARAJ at the end of the month.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

74.     Later that evening jail medical received a call from the lab stating that Johnny's blood results showed he had extremely elevated lactate levels (7.5) so WALSH finally ordered that he be sent to the hospital by ambulance.

75.     An elevated lactate level is typically a bad sign for a patient, often related to increased organ dysfunction and mortality.  A normal blood lactate level is 0.5 to 1 mmol/L.  A level greater than 4 mmol/L defines lactic acidosis.  Lactic acidosis causes muscle ache, burning, and nausea, and can be brought on by heart failure, liver failure, kidney disease or sepsis.  A level high enough to tip the acid-base balance, which may result in a serum pH greater than 7.35, is metabolic acidosis.

76.     Johnny arrived at O'Connor Hospital just after midnight on November 2, 2017.

77.     Upon discharge later that evening, Johnny was diagnosed with lactic acidosis and likely intrahepatic shock liver due to hypoperfusion.  The doctor told Johnny that he should have liver function tests in 1 to 2 weeks, as well as blood work done in the same time frame, and gave him discharge paperwork so indicating.  Johnny reviewed and retained the discharge paperwork.

78.     In November 2017, Johnny reported extreme edema, including of his ankles and penis.  Johnny complained of penile pain due to his penis swelling to three times it's usually size.  Penile edema is known to be a symptom of renal failure.  Despite his condition, Johnny continued to be denied housing in the medical unit.  He would be dead in 6 months.

79.     On November 6, 2017, at 2am a nurse spoke to Johnny who reported that he woke up to urinate and noticed that his penis was swollen.  The nurse noted his left ankle was also swollen and asked the charge nurse and supervisor to schedule an appointment with the doctor

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

for that morning.  Despite this concerning evidence of serious organ dysfunction, Johnny was not examined by a doctor at all on this day.

80.    Around 2pm, 12 hours after the first nurse confirmed Johnny's edema, another nurse responded to his housing unit, 4B1, and assessed him through the door of his cell.  This nurse requested that a doctor follow up, but no one ever did until 3pm the next day.

81.    That night around 10:20pm a third nurse spoke to Johnny about his medical issue and Johnny refused to have his penis examined by the male nurse and stated that he prefers a doctor to do the checkup. Despite insisting on seeing a doctor, another nurse was sent again at 1:21am and Johnny again reported pain and swelling of his penis that had started two days prior and caused his penis to become two or three times its usual size.  That fourth nurse placed an order for Johnny to receive a cold compress to place on the affected area, but not to be dispensed until 8:00am.

82.    On November 7 around 3pm a doctor finally came to see Johnny, at least 37 hours after he brought his issue to Defendants' attention.  Dr. Emilee Wilhelm Leen went to the 4th floor housing unit and spoke to Johnny through the door of his cell.  By this time Johnny had been back from O'Connor Hospital for 5 days but Defendants still had not obtained his medical records from that ER visit when he was admitted to O'Connor.  Johnny told the doctor about his swelling and that he also had shortness of breath.  Dr. Leen requested that he be moved to 2C medical housing unit.

83.    Instead of sending him to a cardiologist or other specialist, Dr. Leen increased his Lasix dosage to 40mg (which had just been decreased to 20mg by the O'Connor doctor 5 days earlier) and requested that he be seen by KANAKARAJ in two days.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

84.     The next day, November 8, Johnny was seen in the infirmary by a nurse and reported that he still had penile swelling the same as the day before.  No doctor checked on Johnny on this day.

85.     On November 9, WALSH checked on Johnny and he was visibly uncomfortable and reported feeling terribly, with increased shortness of breath and continued edema.  WALSH noted that a chest xray performed the day before showed that he may be developing pneumonia.  She finally ordered that he be admitted to VMC, four days after his concerning symptoms were brought to Defendants' attention.

86.     Johnny was hospitalized at VMC for over a week until he was discharged and returned to the jail on November 17.  That evening a nurse tried to administer his Coreg heart medication even though Johnny had already taken his two daily doses that day at the hospital. Johnny refused the dose and informed the nurse to update her records so he does not overdose.

87.     Johnny was not seen by a doctor at the jail until November 20 at which point KANAKARAJ noted that Johnny had persistent thrombocytopenia (low platelet count) since 2015 and needed a referral to a hematologist. It was the end of 2017 and Johnny still had not seen a blood specialist for this issue.

88.     This same day, Johnny was supposed to have court but he was too ill to attend.  He told a jail nurse that he had trouble sleeping because he could not lay flat in bed without getting shortness of breath.  He was forced to sleep with his head at about 30 degrees elevation.

89.     On November 22 a nurse noticed that Johnny's face was puffy and Johnny reported continued shortness of breath preventing him from lying flat.  KANAKARAJ downgraded

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

Johnny's housing needs and moved him from the infirmary in 2C to the medical housing in 2B.

90.     On December 13, 2017 jail medical staff collected a blood specimen from Johnny but the wrong patient name was used causing confusion until staff at the lab realized that they have the results under the name of another inmate, Raul Lozano.

91.     For most of the month of December almost every morning in the 3 o'clock hour a nurse would wake Johnny up to remind him that he should limit his fluid intake.  Johnny asked that he not be awakened for this and that he was aware of the recommended fluid restrictions. Despite this request the very next night at 12:55am the nurse woke him up to remind him of his fluid restrictions.

92.     On January 3, 2018, Dr. Emilee Wilhelm Leen, a doctor who was not Johnny's primary care physician and not a specialist, inexplicably increased Johnny's blood thinner medication without consulting with a doctor who knew Johnny's history, let alone his cardiologist.

93.     Two days later, Johnny was rehoused from the medical housing unit back to general population, over his objection and despite medical need for him to stay where his chronic condition could be properly managed.

94.     At 2:35am on January 6, 2018, a nurse asked the correctional deputy in Johnny's housing unit to wake him up so she could draw his blood, with no regard for her patient's best interest, especially Johnny who had trouble sleeping due to his medical condition.  Johnny asked why he had to do it in the middle of the night when this was just a routine blood draw. The nurse characterized Johnny's response as a refusal and filled out a form called "Refusal of Health Services."  This was one of many times that nursing staff woke Johnny up in the

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

middle of the night for routine medical services, just because it was more convenient for their schedule and not for any medically indicated purpose.

95.    Johnny could tell that the medical staff did not care about his well-being and just saw him as a nuisance.  The doctors refused to let Johnny stay in the medical housing unit, delegated their duties to the nurses who would come at purposely inconvenient hours and disrupt his hard-fought rest.  Powerless to do anything about his treatment, Johnny began refusing to have his blood drawn by the nurses, who continued to wake him up between two and four o'clock in the morning.

96.    On January 10, 2018, CHYORNY was notified that Johnny was refusing blood draw.  Instead of seeing his patient or sending another doctor to check him out, in yet another choice of action exhibiting his deliberate indifference, CHYORNY told the nurse to tell Johnny that if he continues to refuse the blood draw, his medication would be discontinued.

97.    Despite CHYORNY, WALSH and KANAKARAJ being made aware of Johnny's dissatisfaction with his medical treatment, a doctor did not see Johnny until finally on January 17, 2018, WALSH saw him through his cell door on the 4th floor, in his restrictive housing unit.

98.    Johnny told WALSH that he has been refusing blood draws because no one cares about him because he feels sick all the time and his complaints are ignored.  He reported to WALSH that he sometimes gets swollen feet and is sick and fatigued all the time and just does not feel like himself.

99.    Johnny reminded WALSH that he had told her personally in November that he felt terribly and that his chest was on fire, and she dismissed him and gave him Mylanta heartburn medication only to have lab tests later that day confirm he needed hospitalization.  Instead of

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

practicing empathy with her patient and learning from past mistakes of ignoring his complaints, WALSH dismissed him again and told him he must be thinking of a different doctor.

100.   WALSH wrote in her notes that he was "agitated" during this January 17 encounter, and when she pointed out to him that he had seen KANAKARAJ, NEKOMOTO and Dr. Emilee Wilhelm Leen since she saw him in November, he "became further agitated stating that he knows what he is talking about and again stated no one cares."  He again requested to be transferred from the restrictive 4th floor to the 2nd floor medical housing unit where he could get better care.  WALSH, through the lens of her cold indifference to Johnny's medical condition, concluded that Johnny's "desire to move to 2B/C seems less related to feeling like he needs any medical support and more for mental health reasons."  Johnny would be dead in 3.5 months.

101.   Johnny's VMC cardiologist had previously referred him to the Device Clinic to have his pacemaker checked, however jail medical had still not scheduled him an appointment and WALSH was aware of this on January 17, 2018.

102.   On January 18, Johnny was rehoused to the infirmary, where the nurse who admitted him noticed that he was smiling as he was checked in.  Johnny knew he belonged in the infirmary where he had the best chance of receiving much-needed medical attention.

103.   On January 19, CHYORNY met with Johnny who reported that he has been feeling gradually worse in the last two years.  He described feeling like a "toy in which the battery is dying."

104.   CHYORNY screened Johnny for depression but Johnny insisted that he was not depressed, derives pleasure out of several activities and reported being hopeful about his trial

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

that was due to start February 13.  CHYORNY's assessment after this visit was that Johnny's fatigue could be due to his congestive heart failure, but that it was also possible that he is experiencing depression, even though the superficial screen did not seem to be consistent with that.  CHYORNY's treatment plan for Johnny included, among other things, further psychiatric evaluation.

105.  On January 25 Johnny was seen by a psychiatric nurse, Arnold Fosah.  They discussed rehousing Johnny to another floor, but Johnny expressed concern about not getting access to help when needed.  Nurse Fosah wrote in his notes after this encounter that no psychotropic medications were indicated.  Nurse Fosah recommended that Johnny remain housed in 2C, the infirmary of the jail.

106.  On January 30, WALSH had a medical visit with Johnny and again pressured him to move back to general population.  He said he was happier in medical housing and did not fare as well on the 4th or 7th floors due to the diet and the physical demands of bending down to be shackled.  WALSH decided to downgrade him from the infirmary in 2C, to medical housing in 2B.

107.  Johnny had been scheduled to go to the VMC Device Clinic on January 30 per his cardiologist's referral, however the appointment had to be rescheduled since the jail was on lockdown so Johnny could not be transported to the hospital.  When jail medical rescheduled his appointment for a date three weeks later they failed to check his court dates and incompetently set his appointment for a day that conflicted with his upcoming trial which had been on calendar for months.

108.  At various checkups during January and February, Johnny had pedal edema, fluid retention in the feet and lower legs.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

109.   On February 8, the doctors had a meeting and decided to rehouse Johnny back to 2C as a "2B overflow" because 2B was needed for housing prisoners with mobility disabilities and assisted medical devices.  The nurse who admitted him back to the infirmary wrote in her notes that Johnny was smiling and stated, "I'm glad to be back in here."

110.   On February 14, Johnny reported to WALSH that he continues to have shortness of breath and pedal edema.  He stated that "he feels normal, but it's a "bad normal" but doesn't know how to describe it further than that."

111.   Johnny expressed concern to WALSH that his upcoming cardiology appointments had been scheduled on the same days he had court.  Johnny explained that he will be in trial Tuesdays through Fridays so he can only go to doctor's appointments on Mondays.  WALSH emailed the scheduler at VMC to attempt to reschedule around his court dates.

112.   Due to incompetence and/or deliberate indifference to Johnny's medical needs, his cardiology appointment was scheduled for March 15, 2018, a Thursday.

113.   On February 28, NEKOMOTO examined Johnny after he asked to see a doctor because his eye was swollen for a few days.  Macular edema is known to be secondary to congestive heart failure, liver cirrhosis, or renal disease.  NEKOMOTO gave Johnny a warm compress and artificial tears, treating his congestive heart failure patient with over-the-counter products solely ameliorative in nature and without any curative function whatsoever.

114.   On Thursday March 15, 2018, Johnny was in court when jail medical tried to get him from his housing unit for his cardiology appointment that had been scheduled on his behalf despite him informing ACHS that he has court every day except for Mondays.  Inexplicably, the nurse again failed to look at Johnny's upcoming court dates and instead just called "Veronica" who said she would reschedule.  Unsurprisingly to anyone familiar with the

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

practices of jail medical, the appointment was scheduled for a day that Johnny had court: March 27, a Tuesday.

115.   When the nurse came to Johnny's housing unit on Tuesday March 27 to get Johnny for his Cardiac Device Clinic appointment, Johnny was on his way to court.  The nurse presented him with a refusal form to sign, but Johnny told her "I'm not refusing my appointment, I have court.  The best days for my appointments are Mondays."  The nurse wrote an email to "Veronica the scheduler" and WALSH regarding Johnny's "refusal" and requested that his appointment be rescheduled.  In a Kafkaesque response given his repeated reminders that he was only available on Mondays, ACHS and VMC rescheduled Johnny for Thursday April 5.  Johnny would only be alive for 42 more days.

116.   On March 31, Johnny's blood pressure was low, but he was not seen by a doctor.

117.   On April 3 Johnny saw WALSH before he left for court.  He told her that he had shortness of breath, dizziness and also had twenty-minute episode of chest pain, described as pressure.  She again dismissed his health problems as mental health issues and encouraged him to take medication for anxiety.  WALSH sent a message to mental health to see if Johnny could be seen that week to initiate medication.

118.   Despite his illness, specifically his shortness of breath, he was made to walk to court down the stairwell from his housing unit, down the long corridor connecting the jail with the courthouse.

119.   While in the holding cell at court Johnny reported feeling nauseous, dizzy and thirsty. When his criminal defense attorney, Katie Ross, saw him in court, she was shocked at Johnny's appearance.  Having known him for four years, she immediately recognized that he was acutely unwell.  Johnny told her that the jail was ignoring his pleas for treatment.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

120.  Jail medical staff failed to recognize this visible difference in Johnny's appearance and referred him to mental health for "trial anxiety" instead of taking him seriously and getting him treated for his known serious medical condition.

121.  After court on April 3, psychiatric nurse practitioner Arnold Fosah visited Johnny in the infirmary per WALSH's request.  Johnny told Nurse Fosah that he has been feeling tense and short of breath like he's going to pass out or have a heart attack.

122.  Since the Defendants had been dismissive of Johnny's physical complaints and kept telling him it was all in his head, he finally went along with the recommendation that he try medication for possible anxiety.

123.  Pursuant to SMITH, BELIVEAU and CHYORNY's policies Nurse Fosah prescribed Hydroxyzine (Vistaril) and Zoloft to Johnny without consultation with a doctor, let alone a cardiologist or his primary care physician.  Hydroxyzine is known to cause serious heart rhythm anomalies and is to be avoided by patients at highest risk of arrythmia, such as Johnny.  Additionally, heart failure is associated with biological changes that also cause depressive symptoms and studies have shown that SSRIs like Zoloft is not the right drug to treat this depression.  Indeed, research shows that treating heart failure can help relieve depression.  In this case, the Defendants were the only real cause of Johnny's depression, and their disregard for him as a human was contributing to the spiral downward of his physical condition.

124.  That same evening the medications were dispensed to Johnny and he ingested them. Not long after, he began feeling nauseas and had trouble sleeping.  He felt high.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

125.   At 6:41am the next morning, April 4, Johnny told Nurse Loreto Vera Cruz that he had been nauseas since he took the new medication the previous night.  He also complained of the room "being so hot."  He felt weak and like he could not get up.

126.   Later that morning, WALSH came to see Johnny through his cell door and he repeated the same concerns to her that he had already told Nurse Vera Cruz hours earlier.  WALSH prescribed Johnny anti-nausea medication Zofran even though it is contraindicated for heart patients like Johnny because it can cause arrhythmias and other heart rate abnormalities.  Electrocardiogram (ECG) monitoring is recommended in patients with congestive heart failure while taking Zofran.  WALSH nor any ACHS staff provided any ECG monitoring of Johnny.

127.   Within an hour or two of taking the Zofran Johnny reported to WALSH that his nausea was gone but that he continued feeling unwell and weak.  His skin was warm to the touch and he had tachycardia which is concerning for serotonin syndrome which patients are at an increased risk of when Zofran is used with SSRI's; concomitant use of these drugs can be fatal.  WALSH gave Johnny some Tylenol and wrote in her notes that his symptoms seemed more related to anxiety and that there was no clear medical reason that he cannot attend court.

128.   Nurse Yolanda Ramirez noted that Johnny had been laying bed all day and did not want to sit up or get up.  His blood pressure was low.  The nurse documented in her notes that "patient has been calling for Nurse or Doctor today, appears anxious."

129.   That same day, April 4, Ms. Ross arrived to court and was told that Johnny had "refused" transport from jail.  She knew that Johnny was highly committed to his case and would not miss court voluntarily, so she inquired further and was told that he was too ill to come to court.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

130.   Alarmed, Ms. Ross sent her investigator, Mara Hickey, over to the jail to check on his status.  Ms. Hickey returned and informed Ms. Ross that Johnny was not able to get out of his bed to meet with her and they could only speak through the door.  Ms. Hickey could see through the window that Johnny was extremely bloated.

131.   After court that day, Ms. Ross and Ms. Hickey went to the jail to check on Johnny and advocate for him since the medical staff was indifferent to his serious condition which appeared to be quickly deteriorating.

132.   Ms. Ross went to Johnny's housing unit on the second floor of Main Jail North.  When she got to his cell, she noticed it was uncomfortably hot and she estimated the temperature at well over 80 degrees.  She noticed his cell was stuffy and there was tattered medical tape over the heating vent as if put there to block the heat that would not turn off.

133.   The heater in housing unit 2B was malfunctioning on April 4, 2018.

134.   The cell was filthy because Johnny was too sick to clean anything up.

135.   Johnny had not eaten anything all day and had been up all night.

136.   Johnny reported being sick to his stomach and dizzy.  He said that he felt extreme mental impairment.  He attributed the impairment to anti-anxiety medication medical staff had given him at bedtime.  Johnny reported that he feared the new medication did not react well with his heart medication.

137.   Since Ms. Ross and Johnny could not have a confidential conversation in his cell, Johnny mustered the energy to make his way to the private interview room.  Johnny described a terrible night.  He told Ms. Ross that he did not feel like he was in his right mind.  He was in a lot of pain, dizzy and could not eat.  He had asked the nurse for an Ensure to drink for protein/energy.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

138.   The next day, April 5, 2018, Ms. Ross arrived at the jail at 7:40 a.m. to check on Johnny's condition.  He remained bloated but told her he felt a bit better.  They discussed whether he felt like he could go to court.  He said that he still could not eat and was still visibly bloated.

139.   Ms. Ross went to speak with the nurse on duty, DOE 1.  DOE 1 was dismissive of Johnny's condition and told Ms. Ross that Johnny was fine and just had "trial anxiety."

140.   Ms. Ross pointed out Johnny's bloating to DOE 1 who said "he always looks like that." When Ms. Ross, who had at this point known Johnny for four years, disagreed and informed DOE 1 that she sees him almost daily, DOE 1 replied, "I see him every day too.  He looks the same."

141.   Concerned at DOE 1's dismissive and indifferent treatment of Johnny's condition, Ms. Ross brought a different nurse over to Johnny's cell.  Johnny told the nurse and Ms. Ross that his stomach was hard and bloated and that he was uncomfortable.

142.   Meanwhile the correctional deputies appeared and told Johnny to get ready for court. They did not even have a wheelchair for him and were standing at the ready with shackles.

143.   Ms. Ross insisted that he be taken to the hospital, but the staff initially resisted, arguing that he had to be in court.  Ms. Ross pointed out that court cannot proceed without her there and that she was not leaving until he was on his way to the hospital.

144.   Johnny reported that he had gained seven pounds in two days.  This prompted the nurse to agree that they needed to take his vitals and perhaps he was experiencing more than "trial anxiety."

145.   WALSH arrived at 8:25 a.m.  After getting an update on his condition, she spoke to Johnny and observed his physical condition.  Johnny's heart rate and blood pressure were

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

checked, and both were abnormal.  He had a firm and distended abdomen.  His labs from this morning showed a new increase in creatinine as well as elevated liver function tests.  WALSH also noted that he weighed 178.2 pounds whereas two days prior he weighed 171.

146.  WALSH, the nurses and Ms. Ross discussed Johnny's declining health.  WALSH repeated that she did not believe that the Zoloft he received the night before could cause this reaction.  It was then discussed that if the problem did not originate from the Zoloft, then given his weak heart, it could be something more serious.

147.  WALSH reviewed Johnny's medical history and then spoke to him.  WALSH noted that while his stomach was hard and bloated, he did not have swelling in his ankles.  This caused her concern, as water retention in the stomach can indicate organ failure.  WALSH finally ordered that he go to the hospital.

148.  The jail staff finally arranged for Johnny to be transported to the hospital.  He would never return to jail.  Approximately a month later, he was dead.  Meanwhile, his jury trial proceeded against his co-defendants, who were eventually acquitted of homicide.

149.  When Johnny arrived to Valley Medical Center ("VMC") on the morning of April 5, he told doctors that he had chest pain and labored breathing.  Doctors evaluated his lab results and saw that he had elevated troponin, so given his extensive cardiac history combined with chest pain, even a slightly elevated troponin requires hospital admission.

150.  Johnny told the VMC doctors that he started feeling terribly after taking the Zoloft and Vistaril, and reported that prior to that he was feeling relatively well.

151.  Dr. Ishita Aggarwal at VMC examined Johnny and his labs and gave a preliminary diagnosis of likely rhabdomyolysis, a serious syndrome that results from the death of muscle fibers and release of their contents into the bloodstream.  Dr. Aggarwal suspected this was

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

caused by the Zoloft recently given to Johnny at the jail.  Rhabdomyolysis can lead to kidney failure and even death.

152.  The next day, April 6, 2018, investigator Mara Hickey visited Johnny at VMC and they spoke with Ms. Ross by phone.  Johnny told them that while he felt better from having some sleep, his stomach still hurt and he could not eat.

153.  Ms. Ross spoke on the phone to Dr. Beilin Wang, the physician attending to Johnny.  She informed Ms. Ross that Johnny's heart was failing.  He had too much fluid built up in his body and the medical team was working to reduce the fluid.

154.  Johnny told Dr. Wang that his stomach hurts like someone had punched him and that he has found it hard to get out of bed for the past month.  He reported to Dr. Wang that his right shoulder hurts and that happens when he has heart failure.

155.  Dr. Wang spoke to WALSH who told her that Johnny started trial this week and appears depressed from it.

156.  The report from interrogation of Johnny's pacemaker device showed that he had been suffering from persistent atrial fibrillation or arrythmia for the last three days.  Johnny was in heart failure.

157.  Ms. Ross spoke to Dr. Wang again the next day, April 7, 2018, around 7:00 p.m.  Dr. Wang informed Ms. Ross that Johnny was not responding to treatment and had to be put on a drip of medicine designed to treat his heart.  Johnny had also been moved to a different area of the hospital.  Dr. Wang informed Ms. Ross that Johnny's heart failure was now worse than it was during his last stay in the hospital.  Dr. Wang reported that his heart normally operates at 30% of how a healthy heart operates but was currently below that 30% baseline.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

158.  Ms. Ross visited Johnny the next day, April 8, 2018, around 4:30 p.m.  He was sporadically lucid.  While Ms. Ross had just missed the doctor in person, she spoke to Dr. Neelima Komatmeni on the phone before she left her shift.  She informed Ms. Ross that Johnny was not responding to his medication drip and is experiencing liver failure.  Dr. Komatmeni said that Johnny needs to release fluids for his organs to function at their normal baseline, but he cannot process the medicine to do that without his liver working.  She agreed to sign a declaration to this effect and provided it to Ms. Ross.

159.  When Ms. Ross left the hospital that evening around 7:00 p.m., Johnny still could not eat.  He complained of severe pain and thirst.

160.  On April 9, Johnny asked VMC staff to notify his mother that he was hospitalized and update her on his condition.  The nurse obtained Johnny's mother's name and phone number but correctional deputies who were guarding Johnny told the medical staff not to contact Johnny's family.

161.  On April 10, the cardiologist requested that Johnny be moved to the Intensive Care Unit (ICU) from the Progressive Care Unit (PCU).  Johnny was in cardiogenic shock.

162.  In the Cardiac ICU, Dr. Hollister Brewster examined Johnny and confirmed that his situation was dire.  Dr. Brewster asked where Johnny's family was but was told by the correctional officers that the family was aware he was at the hospital but that the medical team should not call the family.  Dr. Brewster told the officers he wanted to speak to the family and wrote in his notes that "this would be the norm in non-incarcerated patients w/ this level of tenuous/critical condition.  Officer to relay this to supervisors and/or pt's family."  Dr. Brewster further memorialized Johnny's worsening condition and poor prognosis and wrote that he wanted to discuss with family but was "holding off for now per bedside officer."

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

163.  No one from the Sheriff's Office ever called or tried to call anyone in Johnny's family while he was hospitalized.

164.  On April 12, Johnny's attorney, Ms. Ross, reached his mother and told her about his condition.  Plaintiff Lucinda Lozano and other family members including Johnny's sister responded to VMC.

165.  Johnny asked the doctor to update his family so that they could ask questions and advocate for him.  The Sheriff's deputies contacted a supervisor at the jail regarding Johnny's family visiting him.  The Sheriff's deputies insisted that each visitor will need to be registered at the jail and have clearance to visit first.

166.  Despite Johnny's weak condition and obvious lack of security threat or escape risk, the Sheriff's deputies only allowed one family member in the room at one time, so Dr. Brewster had to give an update in the hospital room while the remaining family stood outside the doorway.

167.  In his notes Dr. Brewster wrote "per security officers, ok to update family on medical condition."

168.  Dr. Brewster explained to Johnny and his family that he has end-stage cardiac disease with very limited medical treatments available.

169.  Dr. Brewster called Stanford Cardiology and Dr. Fowler who previously treated Johnny, but was unable to reach anyone and left multiple voice messages.  Dr. Brewster also requested that VMC Care Management consult regarding transferring Johnny to Stanford for a higher level of care than what VMC can provide.

170.  On the morning of April 13, VMC Nurse Case Manager Candice Nguyen emailed Care Manager Supervisor, Marah, regarding efforts to arrange Johnny's transfer to Stanford,

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

including the fact that the transfer would need to be authorized by the Sheriff's Office and asking for clarification on the "custody auth process." Ms. Nguyen requested another staff member to fax the referral to Stanford for review.

171.  Around noon, Ms. Nguyen also called and spoke to Stanford transfer center representative Terry who stated that they will review the referral.

172.  That afternoon, Ms. Nguyen was told by VMC cardiologist Susan Zhao to hold off on a transfer to Stanford "as she states there are still addl cardiac interventions that must be attempted here and that realistically, Stanford unlikely to view Pt as a candidate for transplant." Dr. Zhao had unilaterally denied Johnny's hope for a transplant, despite it being the recommendation of his cardiologist Dr. Brewster and the fact that she had not even consulted with Stanford yet.

173.  Around 4pm on the afternoon of April 13, Dr. Zhao spoke with Stanford heart transplant specialist Dr. Fowler who previously treated Johnny in 2011. Dr. Zhao wrote in her notes that Dr. Fowler "recalls that he suspects patient is to some degree mentally impaired and does not have the intellectual capacity to take on the complex decision making and tasks associated with transplantation. Additionally, patient never kept up with follow-up appointments, which is another red flag. Given these two reasons, patient is not a candidate for heart transplant evaluation. So, we will not pursue transfer to Stanford for transplant evaluation."

174.  Johnny was never informed of this decision or given an opportunity to be heard on the matter let alone challenge the assumptions that led him to be deemed to not be a deserving candidate.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

175.  No one from VMC bothered to evaluate Johnny's cognitive abilities, beyond what was apparent from any interaction with him while he was awake: he was intellectually normal.

176.  No one from VMC bothered to ask his attorney, Ms. Ross, who necessarily would have spent quite a bit of time with him on his case and would have recent and pertinent knowledge regarding his level of functioning.  Had they asked, they would have known that Ms. Ross strongly disputes any suggestion that Johnny did not have the intellectual capacity as alleged.  Indeed, she found Johnny to be very involved and on top of his discovery and his case.

177.  In fact, when Ms. Ross spoke to the heart transplant doctor, he told her that the real reason that Johnny was denied a transplant was because the jail system could not care for him post-transplant.

178.  Plaintiff is informed and believes that Dr. Zhao acted as an advocate of the County coffers rather than in Johnny's best interest, and the real reason she interfered with the transfer was because County (VMC, ACHS and Sheriff's Office) did not want to and/or could not properly care for Johnny post-transplant.

179.  On April 14, another Case Manager confirmed with Dr. Hwang that they had determined that Johnny is not a transplant candidate and there would be no transfer to Stanford.

180.  Despite her claim that there were other cardiac interventions for VMC to attempt in justifying denying Johnny's transfer to Stanford, on April 21, Dr. Zhao noted that Johnny was in end stage heart failure and multiorgan failure.  She noted that he was too ill for doctors to perform pericardiocentesis to drain the fluid around his heart.  She documented that Johnny's "prognosis is extremely poor, patient does not seem to have a realistic understanding of his

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

condition." Dr. Zhao understood that Johnny's condition was critical and that VMC could not help him, but she failed to reach out to Stanford or Dr. Fowler to try to save her patient.

181.   Short of organ transplant, Dr. Brewster had also wanted Johnny transferred to Stanford for evaluation for implantation of a Left Ventricular Assist Device (LVAD), which is a mechanical pump that helps the main pumping chamber of the heart pump blood to the rest of the body.  He also wanted Johnny evaluated for an intra-aortic balloon pump (IABP) which is another mechanical device that increases myocardial perfusion and indirectly increases cardiac output through afterload reduction.

182.   Since Johnny was a County jail inmate any medical procedures he had would have to be covered by the County.

183.   When Dr. Zhao unilaterally denied Johnny's transfer to Stanford for these interventions, she effectively signed his death warrant.

184.   The County has a practice of denying medically indicated procedures and interventions to save money, at the expense of prisoners' health.

185.   On April 24, Dr. Zhao noted that Johnny's prognosis was "extremely poor," yet she declined to seek a higher level of care for him.

186.   That day, a pericardiocentesis was performed to drain the liquid around Johnny's heart. This procedure resulted in 1635 cc of pericardial fluid being drained, which is 1.6 liters. Overnight an additional 900 cc was drained.  An ultrasound showed a much smaller yet still present pericardial effusion.  The drainage was bloody which likely contributed to acute blood loss anemia resulting in Johnny needing a blood transfusion.  Still, Dr. Zhao sought no higher level of care for her patient.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

187.   Johnny continued to request that his family be allowed to be involved in his meetings with doctors so that he could have their support with determining his goals of care.  Social Worker Gary Hull requested Sheriff's Office personnel allow the family to attend a meeting with Johnny and the doctors, but in coordination with Deputy County Counsel Teresa Fuentez, the Sheriff's Office would not allow this meeting to occur, despite two correctional deputies guarding Johnny at all times, and him being pretrial and presumed innocent and having no history of escape or other security risks, not to mention his critical condition rendered him unable to escape even if he wanted to.

188.   The Sheriff's Office, County Counsel and VMC knew that the purpose of this meeting was for the doctors to inform Johnny and his family that he was terminally ill and would soon die.

189.   The Sheriff's Office, County Counsel and VMC "allowed" the family to meet with Johnny's doctors after he signed a medical release, but Johnny was not allowed to be present. It is unclear why this meeting required Sheriff's Office or County Counsel approval if Johnny was not allowed to attend anyway, apart from needless and paternalistic interference with the family's association.  Ultimately, the Social Worker convinced the Sheriff's Office and/or County Counsel to let Johnny attend by phone, even though he was right down the hall.

190.   The family meeting took place on April 27.  Johnny expressed frustration due to his recent hospitalizations and how his symptoms and complaints were not fully attended to prior to this hospitalization.  He also expressed concern about the turnover of cardiologists and desired a single doctor who could be in charge of his care.

191.   Dr. Zhao gave Johnny and his family the bad news that he has end stage heart failure complicated by liver failure, coagulopathy and kidney disease.  She had a new explanation for

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

why transplant is not an option, telling Johnny and his family that given how sick he is, he is not a candidate for a heart transplant.  She did not mention that Dr. Brewster had referred him for evaluation for implantation of a mechanical device, or that she had denied him a chance at evaluation at Stanford.

192.  Plaintiff Lucinda Lozano and Johnny's other family members were understandably distraught at the news.

193.  The palliative doctors were present for the meeting.  Johnny said that he was not surprised that this would happen eventually but was surprised that "it would happen this fast." Johnny asked if it was possible for him to get better and the doctors explained that they did not think that it was likely.

194.  Johnny asked how much time he had left to live, and Dr. Zhao explained that she was not sure and that it may be anywhere from days to weeks to months.  She specifically stated that he has two ways to die and that it may happen acutely or over time.  At that point, Johnny expressed that he wanted the meeting to end and to be with his family.

195.  Johnny informed VMC medical staff that he designated his mother, Lucinda Lozano, to be his surrogate decision maker.

196.  Johnny requested to see a chaplain.

197.  Despite his dire prognosis and obvious inability to flee, Defendants' policies and procedures required that Johnny remain shackled to the hospital bed with two Sheriff's deputies at his bedside.  Even though he was on his death bed, his visiting hours were limited to two hours per day.

198.  On May 8, 2018, around 6pm, Johnny was unresponsive and had no pulse.  Medical staff declared "code blue" and performed CPR.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

199.  Around 6:45pm Dr. Alice Chuang requested the Sheriff's deputies to alert Johnny's family that there was an emergency.  No one from the Sheriff's Office contacted the family.

200.  ICU intern Hedieh Matinrad contacted Johnny's mother Lucinda Lozano, who said she was on her way.

201.  Ms. Lozano arrived around 7pm but was not able to see Johnny, even after he was declared dead at 7:29pm.

202.  Social worker Solida Chan got a page at 7:19pm that Johnny was coding and that family needs emotional support.  Ms. Chan arrived at the hospital at 8:17pm and attempted to meet with the family in front of Johnny's room, however she found three Sheriff's deputies guarding the door.  The deputies informed Ms. Chan that Johnny was in custody but was now deceased and that the family is waiting in the hallway.  Ms. Chan asked the deputies to help her locate the family, but they could not be located.  A deputy provided Ms. Chan with Ms. Lozano's phone number.

203.  Ms. Lozano told Ms. Chan that the family was not allowed to see Johnny even after he passed, so they left the hospital.

**Johnny was Subjected to Cruel and Unusual Conditions of Confinement Which Accelerated his Untimely Death.**

204.  Johnny was isolated in a tiny cell for 23 to 24 hours of every day, without receiving out-of-cell time that he is entitled to under state law.

205.  This undue stress and denial of proper opportunity to exercise was especially detrimental to a heart patient like Johnny.

206.  Johnny was regularly forced to sit idle locked in his small cell for 47 hours at a time. This isolation is inhumane, especially for people like Johnny who suffer from preexisting health conditions and are likely to experience serious psychological and physiological harm as

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

a result of these COUNTY practices.  Johnny provided the COUNTY with notice by filing administrative grievances regarding his unconstitutional lack of out-of-cell time and the COUNTY is deliberately indifferent to the serious risk of harm caused by these conditions.

207.  Johnny also at various times had weeks and months long delays in receiving his medications.

208.  This denial of environmental stimulation and basic necessities of life is unacceptable in a civilized society for any prisoner, but it is notable that at the time of his suffering and death Johnny was a pretrial detainee who was not serving a sentence and was presumed innocent.

**The County Has a Policy, Practice and Custom of Providing Deliberately Indifferent Medical Care to Detainees and an Established History of Inadequate Medical Care in the County Jail**

209.  The County of Santa Clara (ACHS and VMC) has a policy and practice of failing to provide adequate medical care to prisoners in its custody and are deliberately indifferent to the fact that its failure to do so subjects prisoners to substantial risk of unnecessary suffering, serious injury and death.

210.  The County of Santa Clara has been on notice that ACHS and VMC's provision of medical care to inmates is inadequate and results in needless harm since at least 2015, when Prison Law Office initiated a class action regarding this and other deficiencies in the jail (*Chavez et al v. County of Santa Clara*, Case No. 15-cv-05277-RMI).

211.  The County further received notice from findings of the Blue Ribbon Commission, including from reports produced during the Commission's investigation into jail conditions.

212.  The complaints brought to the attention of the County included that chronic understaffing hinders County's ability to provide medical care, classify and move inmates within the facility, and maintain inmate safety and security.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

213.  The County maintains insufficient numbers of health care professionals to provide adequate care to the more than 3,000 prisoners in its custody on any given day.  The available health care staff is insufficient to provide medical evaluations, monitoring, and follow-up care to inmates who are suffering from serious and chronic illnesses, or to treat inmates on an emergency basis.

214.  ACHS medical staff are instructed to put off necessary treatment if the prisoner is due to be released or transferred in the foreseeable future, even if it is over a year away.

215.  ACHS medical staff therefore regularly asks inmates at medical appointments how their criminal case is going and when they think they will be transferred or released.

216.  Some prisoners have been pre-trial fighting their cases for as many as eight years while the County denies medical care in the hopes that they will soon resolve their case and move on.

217.  Johnny Lozano, Jr. fought his case for over four years while in the custody of County only to be hospitalized just as his trial began; just weeks after his death, his co-defendants were acquitted of homicide.

### DAMAGES

218.  As a proximate result of Defendants' conduct, Plaintiff's son suffered severe pain, physical injuries, and prolonged suffering until he died.  As a further proximate result of Defendants' conduct, Johnny Lozano suffered long running severe physical pain, severe emotional and mental distress, fear, terror, anxiety, depression, humiliation, embarrassment, and loss of his sense of security, dignity, and pride.

219.  Plaintiff has lost her liberty interest in the companionship and familial association with her son.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

220. The conduct of the individual Defendants was malicious, sadistic, wanton, and oppressive. Plaintiff is therefore entitled to award of punitive damages against the Defendants.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Deliberate Indifference to Serious Medical Needs in Violation of the
Fourteenth Amendment to the Constitution of the United States
(Survival Action - 42 U.S.C § 1983)
(Against Defendants County of Santa Clara, Smith, Beliveau, Chyorny, Walsh,
Nekomoto, Kanakaraj, Zhao and Does 1 – 100)**

221. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

222. Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical treatment and providing appropriate medical treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical issues.

223. Defendants have consistently demonstrated deliberate indifference to their constitutional obligation to provide minimally adequate medical care to inmates in their jails. Defendants' failure to correct their policies, procedures, and practices, despite longstanding and repeated notice of significant and dangerous deficiencies, evidences deliberate indifference in the provision of medical treatment.

224. Defendants were specifically on notice that Johnny Lozano, Jr., was in need of urgent and ongoing medical care for his severe chronic condition and acute conditions related to his organ dysfunction.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

225.   Defendants failed to provide necessary medical treatment to Johnny Lozano, Jr. while he was in their custody and care despite his obvious signs of medical distress.

226.   Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Johnny Lozano, Jr. with appropriate medical care, failure to promulgate appropriate policies and procedures in order to provide treatment to inmates who require monitoring of serious chronic conditions, and failure to appropriately train and/or supervise their staff, constituted deliberate indifference to Johnny Lozano, Jr.'s serious medical needs, health and safety.

227.   As a direct and proximate result of Defendants' conduct, Johnny Lozano, Jr. experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

228.   The aforementioned acts and/or omissions of Defendants Smith and Believeau, in their individual capacities and Drs. Chyorny, Walsh, Nekomoto and Kanakaraj were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### SECOND CLAIM FOR RELIEF
**Failure to Protect from Harm in Violation of the Fourteenth Amendment to the Constitution of the United States
(Survival Action - 42 U.S.C § 1983)
(Against Defendants County of Santa Clara, Smith, Believau, Chyorny, Walsh, Nekomoto, Kanakaraj and Does 1 – 100)**

229.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

230.  Each Defendant could have taken action to prevent unnecessary harm to Johnny Lozano, Jr. but refused or failed to do so.

231.  Defendants County of Santa Clara, Laurie Smith, Troy Beliveau and Alexander Chyorny failed to have minimally necessary policies and procedures concerning the adequate treatment of Johnny Lozano, Jr., whom they knew or should have known was in need of medical attention for his serious congestive heart failure and other acute conditions.

232.  Defendants County of Santa Clara, Laurie Smith, Troy Beliveau and Alexander Chyorny have consistently demonstrated deliberate indifference to their constitutional obligation to provide minimally adequate medical care to inmates in their jails.  Defendants' failure to correct their policies, procedures, and practices, despite longstanding and repeated notice of significant and dangerous deficiencies, evidences deliberate indifference in the provision of medical treatment.

233.  Defendants County of Santa Clara, Laurie Smith, Troy Beliveau, Alexander Chyorny, Kristin Walsh, Jeffrey Nekomoto, and Sean Kanakaraj were specifically on notice that Johnny Lozano, Jr. was in need of urgent medical attention for severe organ dysfunction.

234.  Defendants County of Santa Clara, Laurie Smith, Troy Beliveau, Alexander Chyorny, Kristin Walsh, Jeffrey Nekomoto, and Sean Kanakaraj failed to provide necessary medical treatment to Johnny Lozano, Jr. while he was in their custody and care despite his obvious signs of medical distress.

235.  Defendant County of Santa Clara deputies and medical staff also failed to conduct required safety checks in reasonable intervals as required.

236.  The acts and/or omissions of County of Santa Clara, Laurie Smith, Troy Beliveau, Alexander Chyorny, Kristin Walsh, Jeffrey Nekomoto, and Sean Kanakaraj as alleged herein,

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

including but not limited to their failure to provide Johnny Lozano, Jr. with appropriate medical care, failure to promulgate appropriate policies and procedures in order to provide treatment to inmates who require chronic care, and failure to appropriately train and/or supervise their staff, constituted deliberate indifference to Johnny Lozano, Jr.'s serious medical needs, health and safety.

237.   Johnny Lozano, Jr. placed all Defendants on notice that he had a serious heart condition and other acute organ dysfunction and could die without proper medical care.  Johnny notified custodial and medical staff that he needed his vitals taken, required medication and needed to be evaluated regularly by a doctor.  Santa Clara County (ACHS and VMC) have failed to promulgate appropriate policies and procedures in order to provide treatment to inmates who require chronic care.  Defendants also failed to create minimally necessary polices and procedures for ensuring that medical staff provided known chronic care patients with adequate and necessary medical treatment.  Lastly, Defendants failed to train and supervise medical staff to treat inmates who are chronically ill or suffering from acute medical conditions.

238.   Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to follow a mandated and lifesaving treatment plan, their failure to create minimally necessary policies and procedures for ensuring that medical staff provided inmates who are chronically ill with adequate and necessary medical treatment, and their failure to train and supervise medical staff to treat inmates with serious and life threatening illnesses, constituted deliberate indifference to Johnny Lozano, Jr.'s serious medical needs and safety.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

239.   As a direct and proximate result of Defendants' conduct, Johnny Lozano, Jr.
experienced physical pain, severe emotional distress, and mental anguish, as well as loss of
his life and other damages alleged herein.

240.   The aforementioned acts and/or omissions of Defendants Smith and Believeau, in their
individual capacities and Drs. Chyorny, Walsh, Nekomoto and Kanakaraj were willful,
wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and
punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in
the future.

### THIRD CLAIM FOR RELIEF
**Deprivation of Substantive Due Process Rights in Violation of First and
Fourteenth Amendments to the Constitution of the United States – Right of Familial
Association (42 U.S.C § 1983)
(Against all Defendants)**

241.   Plaintiff incorporates by reference each and every allegation contained in the preceding
paragraphs as if set forth fully herein.

242.   The aforementioned acts and/or omissions of Defendants in being deliberatively
indifferent to Johnny Lozano, Jr.'s serious medical needs, health and safety, violating Johnny
Lozano, Jr's constitutional rights, and their failure to train, supervise, and/or take other
appropriate measures to prevent the acts and/or omissions that caused the untimely and
wrongful death of Johnny Lozano, Jr. deprived Plaintiffs of their liberty interest in a parent-
child relationship in violation of their substantive due process rights as defined by the First
and Fourteenth Amendments to the United States Constitution.

243.   As a direct and proximate result of the aforementioned acts and/or omissions of
Defendants, Plaintiffs suffered injuries and damages as alleged herein.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

244.   The aforementioned acts and/or omissions of Defendants Smith and Believeau, in their

individual capacities and Drs. Chyorny, Walsh, Nekomoto and Kanakaraj were willful,

wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and

punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in

the future.

**FOURTH CLAIM FOR RELIEF**
**Failure to Furnish / Summon Medical Care**
**(Survival Action – California State Law)**
**(Against Defendants County of Santa Clara, Chyorny, Walsh, Nekomoto, Kanakaraj,**
**Zhao and Does 1 – 100)**

245.   Plaintiff incorporates by reference each and every allegation contained in the preceding

paragraphs as if set forth fully herein.

246.   Defendants owed Johnny Lozano, Jr. a duty of care to provide him immediate medical

care.

247.    The conduct of Defendants alleged herein, including but not limited to the facts that

Defendants knew or had reason to know that Johnny Lozano, Jr. was in need of immediate

medical care and that Defendants failed to take reasonable action to summon or provide that

care, resulting in Johnny Lozano, Jr.'s death as alleged herein, violated California state law,

including Cal. Govt. Code §§ 844.6 and 845.6.

248.   Defendants failed  to evaluate, diagnose and treat Johnny Lozano, Jr.'s organ

dysfunction which was evident by virtue of his visible extreme edema, and also failed to

timely and appropriately respond to Johnny's obvious signs of medical distress on numerous

occasions by waiting hours, days, weeks and months to furnish medical care, ignoring his

repeated requests for medical care, failing to address obvious signs of medical distress, and

ignoring the duties of medical staff to treat and monitor his heart condition and other acute

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

symptoms.  Furthermore, Defendants failed to conduct regular health screenings, to take appropriate measures to treat his chronic condition, to appropriately monitor his health and to administer his medications and treatment as ordered.

249.   The alleged conduct of Defendants was committed within the course and scope of their employment.

250.   As a direct and proximate result of Defendant's breach, Johnny Lozano, Jr. suffered injuries and damages causing great pain and leading to his death, as alleged herein.

251.   The aforementioned acts and/or omissions of Chyorny, Walsh, Nekomoto, Kanakaraj and Does 1 through 100 were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**FIFTH CLAIM FOR RELIEF**
**Negligent Supervision, Training, Hiring and Retention**
**(Survival Action – California State Law)**
**(Against all Defendants)**

252.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

253.   Defendants had a duty to hire, supervise, train and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

254.   Defendants breached this duty, causing the conduct alleged herein.  Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

255.   As a direct and proximate result of Defendants' failures, Johnny Lozano, Jr. endured pain, suffering, physical injury, and emotional distress prior to his death as alleged herein.  He also suffered a wholly preventable death, and his parents incurred funeral and burial expenses

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

presently calculated at $7,975.  His parents have also suffered and will continue to suffer

emotional distress, pain, suffering, costs of psychological treatment, loss of familial relations,

loss of society, financial support and care to the extent recoverable and in an amount presently

estimated to exceed $10,000.

### SIXTH CLAIM FOR RELIEF
**Wrongful Death – California Code Civ. Proc. § 377.60**
**(Against Defendants County of Santa Clara, Chyorny, Walsh, Nekomoto, Kanakaraj,**
**Zhao and Does 1 – 100)**

256.  Plaintiff incorporates by reference each and every allegation contained in the preceding

paragraphs as if set forth fully herein.

257.  Johnny Lozano, Jr's death was a direct and proximate result of the aforementioned

wrongful and/or negligent acts and/or omissions of Defendants.  Defendants' acts and/or

omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as

alleged herein.

258.  As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or

omissions, Plaintiff incurred expenses for funeral and burial expenses in an amount to be

proved.

259.  As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or

omissions, Plaintiffs suffered the loss of the services, society, care and protection of the

decedent.  Plaintiffs are further entitled to recover prejudgment interest.

260.  Plaintiff Estate of Johnny Lozano, Jr. is entitled to recover punitive damages against

individual Defendants who, with conscious disregard of Johnny's rights, failed to summon

and provide Johnny with medical treatment meeting the professional standard of practice and

failed to adhere to the legal mandates of prisoner supervision.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

261.  The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### SEVENTH CLAIM FOR RELIEF
**Negligence**
**(Survival Actions – California State Law)**
**(Against County of Santa Clara, Chyorny, Walsh, Nekomoto, and Does 1 – 100)**

262.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

263.  Defendants failed to comply with professional standards in the treatment of Johnny Lozano, Jr.'s serious medical illness by failing to provide him evaluation or treatment for his congestive heart failure and other acute medical conditions, failing to appropriately assess and evaluate his medical needs, ignoring repeated requests for medical care, failing to address obvious signs of medical distress, failing to provide appropriate medical treatment, failing to adopt the minimum polices, procedures, and training necessary to ensure identification of and response to medical emergencies, and ignoring the duties of medical staff to treat and monitor his chronic condition. Furthermore, Defendants failed to conduct regular health screenings, to take appropriate measures to treat his chronic condition, to appropriately monitor his health and to administer his medications and treatment as ordered.

264.  Defendants also failed to appropriately supervise, review, and ensure the competence of officers, jail staff, and medical staffs' provision of treatment to Johnny Lozano, Jr., and failed to enact appropriate standards and procedures that would have prevented such harm to him.

265.  Together, these Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Johnny and Plaintiffs suffered injuries and damages as alleged herein.

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

266.   The negligent conduct of Defendants was committed within the course and scope of their employment.

267.   As a direct and proximate result of Defendants' failures, Johnny Lozano, Jr. endured pain, suffering, physical injury, and emotional distress prior to his death as alleged herein.  He also suffered a wholly preventable death, and his parent incurred funeral and burial expenses presently calculated at $7,975.  His parents have suffered and will continue to suffer emotional distress, pain, suffering, costs of psychological treatment, loss of familial relations, loss of society, financial support and care to the extent recoverable and in an amount presently estimated to exceed $10,000.

268.   The aforementioned acts and/or omissions of Defendants Smith and Believeau, in their individual capacities and Drs. Chyorny, Walsh, and Nekomoto were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**PRAYER FOR RELIEF**,

WHEREFORE, Plaintiffs pray for the following relief:

1.)   For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.)   For damages related to loss of familial association as to Plaintiffs Lucinda Lozano and Johnny Lozano, Sr.;

3.)   Funeral and burial expenses, and incidental expenses not yet full ascertained;

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634

4.)   General damages, including damages for physical and emotional pain, emotional

distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma

and suffering, and the loss of the services, society, care and protection of the decedent;

5.)   Prejudgment interest;

6.)   For punitive and exemplary damages against each individually named Defendant and all

Defendants for which punitive damages are available under the law, in an amount

appropriate to punish Defendant(s) and deter others from engaging in similar

misconduct;

7.)   For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988,

and as otherwise authorized by statute or law;

8.)   For restitution as the court deems just and proper;

9.)   For such other relief, including injunctive and/or declaratory relief, as the Court may

deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this matter, pursuant to FRCP 38(a).


                                              Respectfully submitted,

                                              POWELL & ASSOCIATES

Dated: May 14, 2019                              _/S/ Sarah E. Marinho_
                                              SARAH E. MARINHO
                                              Attorneys for Plaintiff

---

Lawsuit for Violation of Civil Rights
Lucinda Lozano v. County of Santa Clara, et al.
Case No. 19-cv-02634