UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LUCINDA LOZANO, et al.,

         Plaintiffs,

    v.

COUNTY OF SANTA CLARA, et al.,

         Defendants.

Case No. 19-cv-02634-EMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Docket Nos. 25, 26

## I.      INTRODUCTION

Plaintiffs Lucinda Lozano and Johnny Lozano, Sr., individually and as heir to Johnny Lozano, Jr. ("Mr. Lozano"), deceased, and the Estate of Johnny Lozano, Jr. (collectively "Plaintiffs"), filed this lawsuit under 42 U.S.C. §§ 1983 and 1988, and for violations of California state law. They allege that Johnny Lozano, Jr. was denied constitutionally adequate medical care by correctional medical staff and Valley Medical Center employees, who were deliberately indifferent to his serious medical needs. They further allege that this indifference resulted in Mr. Lozano's "tortuous and untimely death" after five years as a pretrial detainee in the Santa Clara County Jail. They seek damages for pre-death pain and suffering, as well as punitive damages against various healthcare providers.

## II.      BACKGROUND

A.    Factual Background

Plaintiffs filed this complaint under 42 U.S.C. §§ 1983 and 1988, and for violations of California state law. Complaint ¶¶ 1, 4, Docket No. 1. Defendants are County of Santa Clara; Laurie Smith (Sheriff of Santa Clara County), in her individual and official capacity; Troy

Beliveau (Assistant Sheriff of Santa Clara County, now retired), in his individual and official capacity; Alexander Chyorny (physician and Director of the on-site jail medical provider Adult Custody Health Services), in his individual and official capacity; Kristin Walsh (physician at Adult Custody Health Services), Jeffrey Nekomoto (physician at Adult Custody Health Services), Sean Kanakaraj (physician at Adult Custody Health Services), Susan Zhao (physician at Valley Medical Center ("VMC")), and Does 1-100 (collectively "Defendants"). *See* Complaint ¶¶ 10–17.

Generally, Plaintiffs allege that Mr. Lozano was "denied constitutionally adequate medical care by correctional medical staff and Valley Medical Center employees who were deliberately indifferent to his chronic medical needs, resulting in his tortuous and untimely death." Complaint ¶ 1. They allege that Defendants were aware that Mr. Lozano had "a chronic heart condition and needed ongoing treatment for congestive heart failure while in the jail." *Id.* ¶ 2. However, Mr. Lozano "was not immediately placed in a medical unit, or provided required medical attention. Santa Clara County had in place substandard policies and practices for identifying and treating prisoners with serious health conditions." *Id.* Over the next five years, Mr. Lozano's heart condition, "progressed to Class IV heart failure, culminating in Johnny's needless suffering for several years and leading to his unnecessarily early death." *Id.* ¶ 28. "County of Santa Clara Sheriff's Office and Valley Medical Center have a policy and practice of failing to provide long-term treatment plans to prisoners in the hope that they will be transferred to state prison, released, or otherwise no longer be the County's problem." *Id.* ¶ 3. This policy and practice leads to delays in timely medical treatment and, Plaintiffs allege that it ultimately denied Mr. Lozano "access to a life-saving organ transplant or medical device implantation because the jail was an unfit place for him to recover." *Id.*

More specifically, Plaintiffs allege the following. Mr. Lozano was arrested and booked into jail on August 7, 2013. *Id.* ¶ 9. At that time, he had "Class I heart failure, the least severe form of heart failure, and [a] manageable condition with the right lifestyle and supportive medical care with routine monitoring." *Id.* ¶ 27. During the intake process, Mr. Lozano informed the jail that he relied on a cardiac pacemaker, *id.* ¶ 29, and the jail's medical staff was aware that he had been diagnosed with cardiomyopathy, arrythmia, thrombocytopenia, and other serious conditions,

2

*id.* ¶ 30.  Plaintiffs allege that rather than "regularly taking Johnny to doctor's appointments with a specialist," the jail's medical staff would "wait[] until he was symptomatic and then would send him to the emergency room where VMC doctors would temporarily stabilize him only to return him to jail with no treatment plan to address his underlying medical issues." *Id.* ¶ 32, 36.

Plaintiffs do not allege any particular medical incidents between Mr. Lozano's entry into the jail on August 7, 2013 and a hospitalization that occurred on October 25, 2016; instead, they simply allege that he experienced "over three years in County custody with subpar medical treatment." *Id.* ¶ 37.  A more detailed chronology of events begins with the hospitalization that he experienced on October 25, 2016.

**2016**

In October 2016, Mr. Lozano "was taken by ambulance to VMC after multiple fainting episodes, including at least one time where he hit his head on the floor after fainting." *Id.* ¶ 37. While at the hospital, it was discovered that the battery in Mr. Lozano's pacemaker was at 3%; he had surgery to have the batteries replaced and was informed that "he should return to the Device Clinic in 3 months for a follow up." *Id.* ¶ 39.  However, "the jail medical staff did not arrange for Johnny to be seen at the Device Clinic until May 2017," four months after doctors recommended that he return to be seen. *Id.*

On November 10, 2016, Mr. Lozano requested that his vitals be checked weekly; he reported that "the doctor said he should be getting his vitals checked weekly," although he did not specify which doctor is alleged to have said this. *Id.* ¶ 41.  A nurse (Amy Flores) checked Mr. Lozano's blood pressure that day, but did not check his body temperature, pulse, or breathing rate, or arrange for weekly vital signs checks; she wrote in her notes that the doctor had not ordered weekly checks of Mr. Lozano's vitals. *Id.*  The jail's medical staff did not check Mr. Lozano's vital signs on a weekly basis after that. *Id.* ¶ 42.

In December 2016, Mr. Lozano "was presented with a refusal form to sign saying that he refused his medical appointment." *Id.* ¶ 43.  However, he had not refused the appointment, so he wrote on the form "I did not refuse my appointment." *Id.*  He asked to reschedule the appointment and was given a new appointment in February 2017. *Id.* ¶ 43, 45.  The Complaint does not explain

3

the purpose of the rescheduled appointment.  Plaintiffs allege that the "jail medical staff has a practice of cancelling medical appointments without notifying the patients and falsely documenting the reason for the cancellation as being that the patient refused the visit.  Either medical or correction staff then presents the prisoner with a refusal form to sign, pursuant to policy." *Id.* ¶ 44.

**2017**

On March 6, 2017, Mr. Lozano was hospitalized "with cardiopulmonary symptoms and reports of dizziness." *Id.* ¶ 47.  He was discharged the next day, but after experiencing dizziness and vertigo and telling the jail medical staff that "it feels like my heart is getting heavier and struggling to beat," he was readmitted on March 9, 2017, where he remained until March 14, 2017. *Id.* ¶¶ 47, 48, 52.  For the entirety of his stay at the hospital, Mr. Lozano was shackled to the hospital bed. *Id.* ¶ 49.  To accommodate the shackles, Mr. Lozano had to keep his arm at an unnatural angle, which caused him lasting pain; the VMC doctors examined his arm and prescribed Norco (an opioid pain reliever), but when he returned to the jail, he was provided with only Tylenol (despite the fact that the pain prevented him from sleeping and that he had visible swelling in his hand). *Id.* ¶¶ 51, 53.

On March 16, 2017, Mr. Lozano reported that he was feeling dizzy. *Id.* ¶ 54.  On March 28, 2017, he met with Dr. Nekomoto to "discuss[] his heart issues including his frequent dizzy spells." *Id.* ¶ 55.  Plaintiffs allege that "[Dr.] Nekomoto inquired as to the status of Johnny's criminal case and if he had a release date." *Id.*

On April 15, 2017, the jail's medical staff "refused to bring Johnny's medication to him when he was too ill to get up" and get it from the common area of the housing unit. *Id.* ¶ 56.  Plaintiffs allege that Dr. Walsh "was made aware of this but made no effort to accommodate Johnny receiving medication at his cell or by moving Johnny to the medical unit." *Id.*

On May 1, 2017, Mr. Lozano went to the VMC Cardiology Clinic, although the Complaint does not specify the reason for the visit. *Id.* ¶ 57.  "The doctor there, Thomas Wentzien, referred Johnny to the Device Clinic to check on his pacemaker, and recommended that he return to the Cardiology Clinic in two to three months and have his labs taken in 60 days." *Id.*

On June 12, 2017, a "stat lab draw" was ordered by Dr. Walsh, but Mr. Lozano was in court at the time of the order, and it was not completed. *Id.* ¶ 58. More than a month went by, and "[b]y July 14, 2017, Johnny still had not had his labs done." *Id.* ¶ 60. It is not clear when, if ever, this blood draw was completed. Plaintiffs also allege that during this time, a nurse tried to administer a medication to Mr. Lozano that he believed had been discontinued from his course of treatment; she sought clarification from the doctor, but it is unclear whether the conflict was ever resolved. *Id.* ¶ 59. By August 2017, Mr. Lozano "was getting frustrated at the lack of treatment for his illness and . . . put in multiple requests to be moved from [the] 7A [housing unit] to the medical unit where he thought he would be treated like a person with a serious medical condition, rather than warehoused and ignored and treated like a complainer whenever he needed medical attention." *Id.* ¶ 61.

On October 22 and 23, 2017, Mr. Lozano reported feeling dizzy and was seen by jail medical staff. *Id.* ¶¶ 62, 63. On both days he had high blood pressure (132/72). On October 23, 2017, he was taken to VMC. *Id.* ¶ 64. While hospitalized, Mr. Lozano "had a transthoracic echocardiogram (TTE) which showed a decrease in his heart's ejection fraction (EF) compared with one year prior. EF refers to how well one's left ventricle pumps blood with each heartbeat. Johnny's EF was now at 25-30%, whereas it had been 30-35% in 2016." *Id.* ¶¶ 65, 66. Blood work done with Mr. Lozano was at the hospital indicated "high levels of aspartate aminotransferase (AST) and high bilirubin levels which can each point to liver disease," as well as a "low levels of $CO_2$ in his blood which can be a sign of kidney disease." *Id.* ¶ 67. Mr. Lozano returned to the jail on October 25. *Id.* ¶ 64.

On October 29, 2017, Mr. Lozano experienced pain "in the top right center of his back and into his right shoulder blade"; however, the nurse offered him only Tylenol and refused to let him see a doctor. *Id.* ¶ 68. Two days later, Mr. Lozano, "reported to jail medical staff that his pain was constant, severe and rapidly worsening. He reported that the Tylenol did not provide relief, the symptoms are aggravated with any movement, and that he has been sleeping poorly." *Id.* ¶ 69. He repeated those same concerns the next morning and was later brought the jail's medical facility by wheelchair; while there, he reported diarrhea, nausea, vomiting, heart palpitations, shoulder

5

pain, and the feeling of his chest being on fire. *Id.* ¶¶ 70, 71. He was only given Mylanta, a medication used to treat heartburn. *Id.* ¶ 72. Later that day, "jail medical received a call from the lab stating that Johnny's blood results showed he had extremely elevated lactate levels (7.5[1]) so [Dr. Walsh] finally ordered that he be sent to the hospital by ambulance." *Id.* ¶ 74. While at the hospital, Mr. Lozano "was diagnosed with lactic acidosis and likely intrahepatic shock liver due to hypoperfusion." *Id.* ¶ 77. The doctor told Mr. Lozano to "have liver function tests in 1 to 2 weeks, as well as blood work done in the same time frame," *id.*; however, it is unclear if that follow-up care occurred.

In November 2017, Mr. Lozano "reported extreme edema, including of his ankles and penis." *Id.* ¶ 78. Plaintiffs allege that "[p]enile edema is known to be a symptom of renal failure." *Id.* On November 6, 2017 at 2 a.m., a nurse observed the swelling and requested an appointment for Mr. Lozano with the doctor; however, Mr. Lozano received minimal follow-up and was not seen by a doctor until the afternoon of November 7, approximately 37 hours after he first brought the problem to a nurse's attention. *Id.* ¶¶ 78–82. The doctor who examined him requested that Mr. Lozano be moved to the medical housing unit. *Id.* ¶ 72. Despite Mr. Lozano's swelling and reported shortness of breath, the doctor who examined him that day only increased Mr. Lozano's Lasix dosage (a diuretic), which had just been reduced by a different doctor five days earlier. *Id.* ¶ 83. On November 8, he was seen only by a nurse, and then on November 9, he was examined by Dr. Walsh. Dr. Walsh noted that an x-ray from the day before "showed that he may be developing pneumonia." *Id.* ¶¶ 84–85. She ordered that he be admitted to VMC, where he was hospitalized for over a week. *Id.* ¶ 86.

On November 17, 2017, Mr. Lozano was discharged and returned to the jail, where a "nurse tried to administer [Mr. Lozano's] Coreg heart medication even though [he] had already taken his two daily doses that day at the hospital. [Mr. Lozano] refused the dose and informed the

---

[1] Plaintiffs allege: "An elevated lactate level is typically a bad sign for a patient, often related to increased organ dysfunction and mortality. A normal blood lactate level is 0.5 to 1 mmol/L. A level greater than 4 mmol/L defines lactic acidosis. Lactic acidosis causes muscle ache, burning, and nausea, and can be brought on by heart failure, liver failure, kidney disease or sepsis. A level high enough to tip the acid-base balance, which may result in a serum pH greater than 7.35, is metabolic acidosis." *Id.* ¶ 75.

6

nurse to update her records so he does not overdose." *Id.* Three days later, he was seen by a doctor, who noted that Mr. Lozano had been dealing with "persistent thrombocytopenia (low platelet count) since 2015 and needed a referral to a hematologist." *Id.* ¶ 87. More than two years had gone by since Mr. Lozano began waiting to see a blood specialist, *id.*; in addition, the blood work conducted at the hospital the month before had also indicated Mr. Lozano's low platelet count, *id.* ¶ 67, although the Complaint does not specify whether any follow-up had been arranged in response to that finding. During this same period, Mr. Lozano reported that "he could not lay flat in bed without getting shortness of breath," and a nurse noticed that his face was puffy, *id.* ¶¶ 88–89. Nonetheless, Dr. Kanakaraj "downgraded" Mr. Lozano from the infirmary to the medical housing unit. *Id.* ¶ 89.

In December 2017, medical staff "collected a blood specimen from Johnny but the wrong patient name was used causing confusion until staff at the lab realized that they have the results under the name of another inmate, Raul Lozano." Id. ¶ 90. It is unclear from the Complaint what, if any, impact this had on Mr. Lozano's care, and/or whether the collection of blood specimens was a regular part of his care at this time.

**2018**

On January 5, 2018, Mr. Lozano was sent back to the general population, "over his objection and despite medical need for him to stay where his chronic condition could be properly managed." *Id.* ¶ 93. Around this time, nurses began waking Mr. Lozano up in the middle of the night to do his routine blood draws, despite their awareness of the difficulty that he had sleeping. *Id.* ¶ 94. Plaintiffs allege:

> Johnny could tell that the medical staff did not care about his well-being and just saw him as a nuisance. The doctors refused to let Johnny stay in the medical housing unit, delegated their duties to the nurses who would come at purposely inconvenient hours and disrupt his hard-fought rest. Powerless to do anything about his treatment, Johnny began refusing to have his blood drawn by the nurses, who continued to wake him up between two and four o'clock in the morning.

*Id.* ¶ 95. Plaintiffs further allege that "Dr. Chyorny told the nurse [who was caring for Mr. Lozano] to tell Johnny that if he continues to refuse the blood draw, his medication would be

7

discontinued." *Id.* ¶ 96. When Dr. Walsh visited Mr. Lozano on January 17, 2018, the visit was conducted through the door of Mr. Lozano's cell. *Id.* ¶ 97. He informed Dr. Walsh of his fear that "no one cares about him because he feels sick all the time and his complaints are ignored," *id.* ¶ 98, but Dr. Walsh was dismissive of his concerns, *id.* ¶¶ 99–100.

On January 30, 2018, Mr. Lozano "had been scheduled to go to the VMC Device Clinic . . . per his cardiologist's referral, however the appointment had to be rescheduled since the jail was on lockdown." *Id.* ¶ 107. That appointment was rescheduled for three weeks later, but that second date conflicted with one of Mr. Lozano's court dates. *Id.* Consequently, the appointment was rescheduled again, but the third appointment (on March 15) also conflicted with Mr. Lozano's court schedule. *Id,* ¶ 111–12. The appointment was again rescheduled, and again fell on a day (March 27) when Mr. Lozano would be in court.[2] *Id.* ¶ 114. The appointment was again rescheduled for April 5, approximately two months after it had originally been scheduled to occur. *Id.* ¶ 115.

In the intervening period, Mr. Lozano "had pedal edema, fluid retention in the feet and lower legs," shortness of breath, swelling in his eye,[3] "dizziness and . . . [a] twenty-minute episode of chest pain, described as pressure." *Id.* ¶¶ 108, 110, 113, 117. In response, Dr. Nekomoto gave him only "a warm compress and artificial tears, treating his congestive heart failure patient with over-the-counter products solely ameliorative in nature and without any curative function whatsoever." *Id.* ¶ 113. The medical staff at the jail also screened Mr. Lozano for depression, *id.* ¶ 104, referred him to a psychiatric nurse, *id.* ¶ 105, and "encouraged him to take medication for anxiety," *id.* ¶ 117. He also experienced at least one period of low blood pressure, but he was not seen by a doctor. *Id.* ¶ 116.

On April 3, 2018, Mr. Lozano went to court and his attorney "was shocked at Johnny's

---

[2] Plaintiffs also allege that "[w]hen the nurse came to Johnny's housing unit on Tuesday March 27 to get Johnny for his Cardiac Device Clinic appointment, Johnny was on his way to court. The nurse presented him with a refusal form to sign, but Johnny told her 'I'm not refusing my appointment, I have court.'" *Id.* ¶ 115.

[3] Plaintiffs allege that "[m]acular edema is known to be secondary to congestive heart failure, liver cirrhosis, or renal disease." *Id.* ¶ 113.

appearance. Having known him for four years, she immediately recognized that he was acutely unwell. Johnny told her that the jail was ignoring his pleas for treatment." *Id.* ¶ 119. Medical staff at the jail continued to insist to Mr. Lozano that he was experiencing "trial anxiety." *Id.* ¶ 120. Under the pressure of this insistence, Mr. Lozano "finally went along with the recommendation that he try medication for possible anxiety." *Id.* ¶ 122. Plaintiffs allege that "[p]ursuant to Smith, Beliveau and Chyorny's policies Nurse Fosah prescribed Hydroxyzine (Vistaril) and Zoloft to Johnny without consultation with a doctor, let alone a cardiologist or his primary care physician." *Id.* ¶ 123. They further allege that "Hydroxyzine is known to cause serious heart rhythm anomalies and is to be avoided by patients at highest risk of arrythmia, such as Johnny." *Id.* "Additionally, . . . Zoloft is not the right drug to treat . . . depression" when heart failure may be causing biological changes in the body. *Id.* After taking the medications, Mr. Lozano felt nauseous, high, and weak, and he had trouble sleeping. *Id.* ¶¶ 124–25.

On April 4, 2018, Mr. Lozano was given Zofran for the nausea, "even though it is contraindicated for heart patients like Johnny because it can cause arrhythmias and other heart rate abnormalities. Electrocardiogram (ECG) monitoring is recommended in patients with congestive heart failure while taking Zofran," however, no ECG monitoring was provided. *Id.* ¶ 126. When Mr. Lozano's attorney was told that he was too ill to go to court that day, she sent her investigator to check on him. *Id.* ¶ 130. He was unable to get out of bed to speak with the investigator, and she could see that he was extremely bloated. *Id.* Later that day, Mr. Lozano's attorney and her investigator returned to the jail "to check on Johnny and advocate for him since the medical staff was indifferent to his serious condition which appeared to be quickly deteriorating." *Id.* ¶ 131. Mr. Lozano told his attorney that he had not eaten anything that day, had not slept the night before, had been sick to his stomach and dizzy, was in a lot of pain, and "feared the new medication did not react well with his heart medication." *Id.* ¶¶ 135–37.

The next day, on April 5, 2018, Mr. Lozano's attorney "pointed out Johnny's bloating to [a nurse, DOE 1] who said 'he always looks like that.' When [Mr. Lozano's attorney], who had at this point known Johnny for four years, disagreed and informed DOE 1 that she sees him almost daily, DOE 1 replied, 'I see him every day too. He looks the same.'" *Id.* ¶ 139. Mr. Lozano's

attorney called over another nurse, and ultimately, insisted that Mr. Lozano "be taken to the hospital." *Id.* ¶ 143. When the staff resisted, Mr. Lozano's attorney stated "that she was not leaving until he was on his way to the hospital." *Id.* Dr. Walsh arrived and noted that Mr. Lozano's heart rate and blood pressure were abnormal, his abdomen was distended and firm, and he had gained 7 pounds in two days; this caused him to order that Mr. Lozano be taken to the hospital. *Id.* ¶¶ 145–47.

At the hospital, "Dr. Ishita Aggarwal at VMC examined Johnny and his labs and gave a preliminary diagnosis of likely rhabdomyolysis, a serious syndrome that results from the death of muscle fibers and release of their contents into the bloodstream. Dr. Aggarwal suspected this was caused by the Zoloft recently given to Johnny at the jail. Rhabdomyolysis can lead to kidney failure and even death." *Id.* ¶ 151. On April 6, 2018, doctors told his attorney "that Johnny's heart was failing. He had too much fluid built up in his body and the medical team was working to reduce the fluid." *Id.* ¶ 153. In addition, "Johnny's pacemaker device showed that he had been suffering from persistent atrial fibrillation or arrythmia for the last three days. Johnny was in heart failure." *Id.* ¶ 156. On April 7, 2018, the VMC doctor told Mr. Lozano's attorney that Mr. Lozano was not responding to treatment. *Id.* ¶ 157. The next day, doctors informed Mr. Lozano's attorney that he was experiencing liver failure. *Id.* ¶ 158. That evening Mr. Lozano could not eat, and he complained of severe pain and thirst. *Id.* ¶ 159.

On April 9, 2018, Mr. Lozano requested that VMC staff contact his mother to inform her about his condition, but "correctional deputies who were guarding Johnny told the medical staff not to contact Johnny's family." *Id.* ¶ 160. On April 10, 2018, correctional officers told the ICU doctor told "that the medical team should not call [Mr. Lozano's] family." *Id.* ¶ 161. The doctor noted in his records that speaking with the family "would be the norm in non-incarcerated patients w/ this level of tenuous/critical condition. Officer to relay this to supervisors and/or pt's family." *Id.* However, Plaintiffs allege that "[n]o one from the Sheriff's Office ever called or tried to call anyone in Johnny's family while he was hospitalized," and Mr. Lozano's family only found out about Mr. Lozano's condition when his attorney reached them on April 12. *Id.* ¶¶ 163–64.

On April 10, Mr. Lozano was moved to the Intensive Care Unit because he was in

cardiogenic shock. *Id.* ¶ 160. There, the doctor treating Mr. Lozano "requested that VMC Care Management consult regarding transferring Johnny to Stanford for a higher level of care than what VMC can provide," and outreach to Stanford began on April 13, 2018. *Id.* ¶¶ 169–70. However, later that same afternoon Plaintiffs allege that "Dr. Zhao spoke with Stanford heart transplant specialist Dr. Fowler who previously treated Johnny in 2011. Dr. Zhao wrote in her notes that Dr. Fowler 'recalls that he suspects patient is to some degree mentally impaired and does not have the intellectual capacity to take on the complex decision making and tasks associated with transplantation. Additionally, patient never kept up with follow-up appointments, which is another red flag. Given these two reasons, patient is not a candidate for heart transplant evaluation. So, we will not pursue transfer to Stanford for transplant evaluation.'" *Id.* ¶ 173. However, Mr. Lozano "was never informed of this decision or given an opportunity to be heard on the matter let alone challenge the assumptions that led him to be deemed to not be a deserving candidate," nor did anyone at VMC evaluate Mr. Lozano's cognitive abilities. *Id.* ¶ 174–75. Furthermore, when Mr. Lozano's attorney "spoke to the heart transplant doctor, he told her that the real reason that Johnny was denied a transplant was because the jail system could not care for him post-transplant." *Id.* ¶ 177.

Plaintiffs allege that, around this time, "Dr. Zhao understood that Johnny's condition was critical and that VMC could not help him, but she failed to reach out to Stanford or Dr. Fowler to try to save her patient." *Id.* ¶ 180. Her decision not to transfer Mr. Lozano to Stanford meant that he was never evaluated for implantation of a Left Ventricular Assist Device or an intra-aortic balloon pump, as Dr. Brewster had recommended. *Id.* ¶ 181.

On April 27, 2018, "Dr. Zhao gave Johnny and his family the bad news that he has end stage heart failure complicated by liver failure, coagulopathy and kidney disease." *Id.* ¶ 191. Mr. Lozano was not permitted to be in the same room as his family during that meeting. *Id.* ¶ 189. Dr. Zhao also "had a new explanation for why transplant [was] not an option, telling Johnny and his family that given how sick he [was], he [was] not a candidate for a heart transplant. She did not mention that Dr. Brewster had referred him for evaluation for implantation of a mechanical device, or that she had denied him a chance at evaluation at Stanford." *Id.*

11

United States District Court
Northern District of California

On May 8, 2018 at around 6pm, Mr. Lozano "was unresponsive and had no pulse. Medical staff declared 'code blue' and performed CPR." *Id.* ¶ 198. "Dr. Alice Chuang requested the Sheriff's deputies to alert Johnny's family that there was an emergency," but they did not contact the family. *Id.* ¶ 199. Ultimately, the ICU intern contacted Mr. Lozano's mother, who came right away, but the family was not permitted to see Mr. Lozano, even after he died. *Id.* ¶¶ 199–203. The Lozano family left the hospital without seeing their son. *Id.* ¶ 203.

B.    Procedural Background

Plaintiffs filed "governmental tort claims with Defendant County of Santa Clara including on behalf of the Estate of Johnny Lozano, Jr., on November 7, 2018." Complaint ¶ 23. That claim provided notice to the County, VMC, and Drs. Chyorny, Walsh and Nekomoto of "Plaintiffs' intention to file suit against them based on their negligence in providing professional healthcare services." *Id.* The Complaint does not specify whether notice was provided to Laurie Smith, Troy Beliveau, Sean Kanakaraj, or Susan Zhao. *See id.* The County rejected the governmental tort claims by letter on December 14, 2018. *Id.* ¶ 24.

Plaintiffs filed this lawsuit in May 2019. *See* Docket No. 1. On October 8, 2019, Defendants filed a Motion to Dismiss Plaintiffs' Complaint, *see* Docket No. 25, and a Motion to Strike Portions of Plaintiffs' Complaint, *see* Docket No. 26. They are the only two motions pending before the Court.

**III.    DISCUSSION**

A.    Motion to Dismiss

1.    Legal Standard

To survive a 12(b)(6) motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's factual allegations in the complaint "must . . . suggest that the claim has at least a plausible chance of success." *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1107 (9th Cir. 2013). In other words, the complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

The Ninth Circuit has settled on a two-step process for evaluating pleadings. It explains the established approach as follows:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134–35 (9th Cir. 2014). Notably, the plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'" *Iqbal*, 556 U.S. at 678.

    2.  <u>Analysis</u>

Before analyzing Claims One through Three as they relate to each Defendant, the Court addresses several claims that can be disposed of as to all Defendants.

    a.  <u>Voluntary Dismissal of Fourth and Fifth Claims</u>

Plaintiffs voluntarily dismissed Claims Four (a claim alleging failure to furnish or summon medical care brought against the County and the various doctors, *see* Complaint ¶¶ 245–51) and Five (a claim alleging negligent supervision, training, hiring, and retention, *see* Complaint ¶¶ 252–55). MTD Opp. at 1. Accordingly, Claims Four and Five are **DISMISSED** as to all Defendants. Because the Court cannot determine at this time whether amendment as to Claims Four and Five would be futile, the dismissal is without prejudice. *See, e.g.*, *Preciado v. Wells Fargo Home Mortg.*, No. 13-00382 LB, 2013 WL 1899929, at *7 (N.D. Cal. May 7, 2013) (dismissing complaint without prejudice where it could not determine whether the pleading could be cured).

    b.  <u>Dismissal of Sixth and Seventh Claims</u>

Plaintiffs' sixth claim for relief is a wrongful death claim (brought against the County and the doctors), brought pursuant to § 377.60 of the California Code of Civil Procedure. *See* Complaint ¶¶ 256–61. Plaintiffs' seventh claim for relief is a negligence claim (brought against

the County and Drs. Chyorny, Walsh, and Nekomoto).  *See id.* ¶¶ 262–68.

### i.    Immunity as to County

Defendants argue that "Government Code section 844.6 immunizes a public entity for any injury proximately caused by a prisoner or to a prisoner," and therefore requests that the Court dismiss Claims Six and Seven as against the County.  Mot. at 26 (citing Cal. Gov. Code § 844.6(a)).  In relevant part, Section 844.6 states that "a public entity is not liable for . . . [a]n injury to any prisoner."  Cal. Gov. Code § 844.6(a).  Plaintiff does not challenge this argument in the Opposition, and as a result the Court deems the claims waived as to the County.  *See, e.g.*, *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009), *aff'd*, 646 F.3d 1240 (9th Cir. 2011) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived.").  Thus, Claims Six and Seven are **DISMISSED** as to the County.  The dismissal is with prejudice.

### ii.    Time Bar as to Individual Defendants

Defendants contend that Claims Six and Seven as to the individual defendants are governed by California Code of Civil Procedure § 340.5 (enacted as part of the Medical Injury Compensation Reform Act ("MICRA")), which imposes a one-year statute of limitations on wrongful death suits brought against "health care providers."  *See* MTD at 27.  Section 340.5 provides:

> In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first.  In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person.

Cal. Civ. Proc. Code § 340.5.[4]  Thus, Defendants argue: "Lozano's death occurred on May 8,

---

[4] Section 340.5 defines "health care provider" as "any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and

14

2018, and therefore, the one-year statute of limitations ran on May 8, 2019.  Plaintiffs did not file

their complaint until May 14, 2019, six days after the statute of limitations had already expired.

Accordingly, plaintiffs' cause[s] of action for wrongful death [and negligence are] time-barred,

and defendants' motion to dismiss Claim 6 [and Claim 7] should be granted without leave to

amend."  MTD at 28, 29.

Plaintiffs advance several arguments challenging the notion that the claims are time-barred.

First, they assert that the Complaint was filed "well within the two-year statute of limitations" for

(non-health-care-provider) wrongful death claims.  MTD Opp. at 22–23; *see also* Cal. Code Civ.

Proc. § 335.1 (specifying a two-year statute of limitations for "[a]n action for assault, battery, or

injury to, or for the death of, an individual caused by the wrongful act or neglect of another").

However, this argument is without merit, as the one-year statute of limitations contemplated by §

340.5 supplants the two-year statute of limitations contemplated by § 335.1 when the injury is

caused by a health care provider.  *See, e.g.*, *Nava v. Saddleback Mem'l Med. Ctr.*, 4 Cal. App. 5th

285, 290 (Ct. App. 2016) ("A one-year statute of limitations applies, however, when the injury is

caused by the professional negligence of a health care provider.").

Next, Plaintiffs contend that—even if the Court finds that the MICRA one-year statute of

limitations applies—California Code of Civil Procedure § 364 tolls the statute of limitations for 90

days.  MTD Opp. at 23.  However, tolling only applies "[i]f the notice is served within 90 days of

the expiration of the applicable statute of limitations."  Cal. Civ. Proc. Code § 364 (West).[5]

However, Plaintiffs' Government Claims Act claim was filed on November 7, 2018, more than

180 days before the statute of limitations ran on May 9, 2019.  *See* Complaint ¶ 23.  Because

notice was not served within 90 days of the expiration of the limitation period, § 364 does not toll

the statute for Plaintiffs.

Finally, Plaintiffs argue that "when the Government Claims Act requires presentation of a

---

any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with
Section 1200) of the Health and Safety Code."  Cal. Civ. Proc. Code § 340.5.

[5] "If the notice is served within 90 days of the expiration of the applicable statute of limitations,
the time for the commencement of the action shall be extended 90 days from the service of the
notice."  Cal. Civ. Proc. Code § 364.

written claim as a prerequisite to suit, the statute of limitations is six months from mailing of written notice of rejection of the claim. In this case, the County mailed it's [sic] rejection letter on December 14, 2018, at which time the six month statute of limitations began to run on the state claims." MTD Opp. at 23. However, courts have held that parties must comply with *both* the Government Claims Act requirements and §340.5 of the California Code of Civil Procedure. *See, e.g., Roberts v. Cty. of Los Angeles*, 175 Cal. App. 4th 474, 481 (2009) ("[The two statutes] are not mutually exclusive and may be read to give effect to both. We construe the . . . limitations period in Code of Civil Procedure section 340.5 as the outer limit by which a lawsuit must be filed against a public health care provider. This way MICRA can apply to public health care providers without conflicting with the Government Claims Act." (internal citations omitted)). The Government Claims Act does not toll Plaintiffs' claims.

Consequently, Claims Six and Seven are time barred as they pertain to the individual doctors and are therefore **DISMISSED** as to those Defendants. Because the deficiencies cannot be cured by amendment, the dismissal is with prejudice.

### c.    First, Second, and Third Claims

In assessing the remaining claims—Claims One through Three—the Court examines them as to each individual Defendant.

#### i.    Legal Standard for Claims One and Two

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "The due process clause of the Fourteenth Amendment guarantees that pretrial detainees receive constitutionally adequate medical and mental health care. *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn,* 563 U.S. 915 (2011), *opinion reinstated*, 658 F.3d 897 (9th Cir. 2011)." MTD Opp. at 12. Plaintiffs' first claim for relief is a claim under 42 U.S.C. § 1983 for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment (brought against all Defendants). *See* Complaint ¶¶ 221–28. Plaintiffs' second claim for relief is a claim under 42 U.S.C. § 1983 for

failure to protect from harm in violation of the Fourteenth Amendment (brought against all Defendants). *See* Complaint ¶¶ 229–40.

With respect to the claim of deliberate indifference to serious medical needs (brought against individuals), there are two requirements:

> A determination of "deliberate indifference" involves an examination of two elements: [1] the seriousness of the prisoner's medical need and [2] the nature of the defendant's response to that need. . . . A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."

*McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  Because defendants concede that Mr. Lozano had serious medical needs, Reply in Support of Motion to Dismiss ("MTD Reply") at 3, Docket No. 34, only the second element (defendants' response to that need) is at issue with respect to each Defendant.

"[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard."  *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019) (citing *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)).  Based on that objective deliberate indifference standard, a pretrial detainee's medical care claim (against an individual) must contain the following elements:

> (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) by not taking such measures, the defendant caused the plaintiff's injuries. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'"

17

*Gordon*, 888 F.3d at 1124–25.

Moreover, "[d]eliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Even gross negligence can be insufficient to establish a constitutional violation. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990). Similarly, "mere malpractice" does not establish a constitutional violation. *Id.*; *see also Thompson v. Worch*, 6 F. App'x 614, 616 (9th Cir. 2001) (noting that even malpractice does not establish a constitutional violation). "[T]he plaintiff must 'prove more than negligence but less than subjective intent— something akin to reckless disregard.'" *Gordon*, 888 F.3d at 1125 (citing *Castro*, 833 F.3d at 1070). "[A] difference in medical opinion does not constitute deliberate indifference." *George v. Sonoma Cty. Sheriff's Dep't*, 732 F. Supp. 922, 937 (N.D. Cal. 2010) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989)). Misdiagnosis does not establish a constitutional violation. *See DiMarzio v. Jacobs*, 162 F. App'x 774, at *1 (9th Cir. 2006) (affirming district court's dismissal of "claims that defendants acted with deliberate indifference by misdiagnosing his ruptured disc"). Instead, "[i]n order for deliberate indifference to be established . . . there must be a purposeful act or failure to act on the part of the defendant and resulting harm." *Moore v. Thomas*, 653 F. Supp. 2d 984, 1000 (N.D. Cal. 2009) (citing *McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir.1985)). "A difference of medical opinion may amount to deliberate indifference if the prisoner shows that 'the course of treatment was medically unacceptable under the circumstances' and defendants 'chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Watson v. Veal*, 302 F. App'x 654, 655 (9th Cir. 2008) (quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996).

Where delay in treatment is the alleged basis of deliberate indifference, "the delay must have caused substantial harm." *Wood*, 900 F.2d at 1335 (citing *Shapley,* 766 F.2d at 407).

With respect to the "failure to protect" claim, the Supreme Court has explained that "medical care claims" should be treated as "substantially the same as other conditions of confinement violations including failure-to-protect claims." *Gordon*, 888 F.3d at 1124 (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). Within the Ninth Circuit, the elements for such a claim are the same as those required for a "failure to provide medical care" claim. *See Castro*, 833

F.3d at 1071 (enumerating the same factors listed above for "a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer").

ii.   <u>Legal Standard for Claim Three</u>

Plaintiffs' third claim for relief is a claim under 42 U.S.C. § 1983 for deprivation of substantive due process rights in violation of the First and Fourteenth Amendments (brought against all Defendants). *See* Complaint ¶¶ 241–44. Specifically, Plaintiffs contend that Defendants "deprived Plaintiffs of their liberty interest in a parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution." Complaint ¶ 242.

"Whether a defendant's conduct shocks the conscience turns on the facts of the particular case." *Figueira by & through Castillo v. Cty. of Sutter*, No. 2:15-CV-00500-KJM-AC, 2015 WL 6449151, at *6 (E.D. Cal. Oct. 23, 2015) (citing *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir.1998)). "Deliberately indifferent conduct may shock the conscience." *Figueira*, 2015 WL 6449151, at *6. And "[a] prison official's deliberate indifference to a prisoner's serious medical needs shocks the conscience and states a claim under the substantive due process clause." *Estate of Prasad ex rel. Prasad v. Cty. of Sutter*, 958 F. Supp. 2d 1101, 1116 (E.D. Cal. 2013) (concluding that such conduct could constitute deliberate indifference even where the incarcerated person "was seen and treated, placed under observation by medical staff, and finally transported to the hospital"); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (noting that "deliberate indifference can rise to a constitutionally shocking level" when it fails "to attend to the medical needs of prisoners"); *id.* (when "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause" (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)); *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) ("Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also 'rise to the conscience-shocking

level' required for a substantive due process violation.  A prison official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner.").

### iii.    Defendants Smith and Beliveau

Plaintiffs' specific allegations against Smith (the Sheriff of Santa Clara County) and Beliveau (the former Assistant Sheriff of Santa Clara County) are (1) that their policies required that Mr. Lozano be shackled to the hospital bed while receiving treatment in March 2017, Complaint ¶ 49, and (2) that pursuant to their policies "Nurse Fosah prescribed Hydroxyzine (Vistaril) and Zoloft to Johnny without consultation with a doctor" in March 2017, *id.* ¶ 123. Defendants argue both that these claims are time-barred and that plaintiffs failed to allege a constitutional violation as to Smith and Beliveau.  Motion to Dismiss ("MTD") at 12–15, Docket No. 25.  Plaintiffs do not respond to these arguments in their opposition (or even mention Smith or Beliveau outside of their summary of the factual background of the case); thus, any objections to these arguments are deemed waived.  *See, e.g.*, *Conservation Force*, 677 F. Supp. 2d at 1211 ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived.").  As a result, the Court **DISMISSES** Claims One and Two, as against Smith and Beliveau.  The dismissal is with prejudice.

Furthermore, because the claims alleging deliberate indifference as to Smith and Beliveau have been dismissed, the basis for a substantive due process violation by those Defendants likewise should be dismissed.  Without conduct rising to the level of deliberate indifference, there can be no conduct that "shocks the conscience," as is required for a violation of substantive due process.  As a result, Claim Three, as against Smith and Beliveau is also **DISMISSED** with prejudice.

### iv.    Defendant Dr. Chyorny

Plaintiffs allege three things against Dr. Chyorny: (1) that he "threatened Johnny with discontinuing his medication should he continue to refuse the middle-of-the-night blood draws from the nurses," Complaint ¶ 96, (2) that he "recommended further psychiatric evaluation for Johnny" after suspecting that he might have depression, *id.* ¶ 104, and (3) that he was responsible

20

1    for the promulgation of the policies under which "Johnny was prescribed hydroxyzine and Zoloft

2    . . . [with] hydroxyzine being a medication not recommended for patients at risk of arrhythmia,"

3    *id.* ¶ 123, a condition with which "Dr. Chyorny was aware Johnny was diagnosed," Opposition to

4    Motion to Dismiss ("MTD Opp.") at 15, Docket No. 33.

5           With respect to the first allegation, Dr. Chyorny did not actually deny Mr. Lozano medical

6    treatment. While he is alleged to have threatened Mr. Lozano with the denial of medication, mere

7    threats (even threats of serious physical harm) do not rise to the level of a constitutional violation.

8    *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) ("it trivializes the [E]ighth [A]mendment to

9    believe a threat constitutes a constitutional wrong"). In addition, his actions were intended to get

10   Mr. Lozano to comply with blood draws, which Plaintiffs themselves have argued were critical

11   and medically necessary. Thus, Plaintiffs have not established that Dr. Chyorny's actions were

12   based on *indifference* to Mr. Lozano's medical condition, nor are they able to allege that his threat

13   rises to the level of a constitutional violation.

14          With respect to the second allegation (that Dr. Chyorny recommended further psychiatric

15   evaluation for Mr. Lozano after suspecting he might have depression), this does not establish

16   deliberate indifference. Dr. Chyorny was concerned about Mr. Lozano's wellbeing and he acted

17   by seeking additional evaluation and treatment for him. Even if this was a misdiagnosis,

18   misdiagnosis does not constitute deliberate indifference. *See DiMarzio*, 162 F. App'x, at *1.

19          With respect to the third allegation (that Dr. Chyorny was responsible for the promulgation

20   of the policies under which Mr. Lozano was prescribed medications the were contraindicated for

21   someone with his health conditions), again misdiagnosis, medical malpractice, or even gross

22   negligence do not rise to the level of deliberate indifference. *See Wood*, 900 F.2d at 1334;

23   *Thompson*, 6 F. App'x at 616; *DiMarzio*, 162 F. App'x, at *1. While the medication prescribed to

24   Mr. Lozano was contraindicated for him, Dr. Chyorny's actions in permitting such error did not

25   constitute a "purposeful act or failure to act on the part of the defendant and resulting harm."

26   *Moore*, 653 F. Supp. 2d at 1000.

27          As a result, the Court **DISMISSES** Claims One and Two, as against Dr. Chyorny. The

28   dismissal is with prejudice.

In addition, as Dr. Chyorny's conduct does not rise to the level of deliberate indifference, it cannot be said to "shock the conscience," as is required for a violation of substantive due process. *See, e.g.*, *Lemire*, 726 F.3d at 1075 (noting that deliberate indifference may sometimes "'rise to the conscience-shocking level' required for a substantive due process violation"). As a result, Claim Three, as against Dr. Chyorny is also **DISMISSED** with prejudice.

v.     <u>Defendant Dr. Walsh</u>

Plaintiffs bring several claims against Dr. Walsh. They allege (1) that Dr. Walsh provided Mr. Lozano with only Tylenol after VMC had prescribed him Norco, (2) that Dr. Walsh made no effort to attend to Mr. Lozano when he was too ill to go to "pill call," (3) that Dr. Walsh permitted long delays in Mr. Lozano getting his required blood draws, (4) that Dr. Walsh caused delays in getting Mr. Lozano to the hospital when he became seriously ill in November 2017, (5) that Dr. Walsh believed that Mr. Lozano wanted to be in medical housing for "mental health reasons," (6) that Mr. Lozano's cardiology appointment was unnecessarily delayed, and (7) that Dr. Walsh gave Mr. Lozano a medication that was contraindicated for patients with arrythmia. MTD Opp. at 17.

Because neither "mere malpractice" nor gross negligence rises to the level of deliberate indifference, allegations (1) (regarding the provision of Tylenol), (5) (regarding Dr. Walsh's beliefs about why Mr. Lozano wanted certain housing), and (7) (regarding the provision of a contraindicated medication) are insufficient to allege deliberate indifference. With respect to (1), "a difference in medical opinion does not constitute deliberate indifference." *George*, 732 F. Supp. 2d at 937. Thus, Dr. Walsh's determination that Tylenol was appropriate where other doctors had prescribed Norco does not rise to the level of deliberate indifference. With respect to (5), there was no "purposeful act or failure to act" by Dr. Walsh that resulted in harm to Mr. Lozano. *See Moore*, 653 F. Supp. 2d at 1000. And with respect to (7), there is no indication that the provision of contraindicated medication was a "purposeful act" by Dr. Walsh; to the contrary, his actions would constitute malpractice, not an intentional disregard for Mr. Lozano's wellbeing.

"Failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need." *Johnson v. Schwarzenegger*, 366 F. App'x 767, 770 (9th Cir. 2010). However, "it is also possible that any such failure does not [amount to

22

deliberate indifference] on the facts of a particular situation." *Id.* According to allegation (2), on

April 15, 2017, Mr. Lozano was "was too ill to get up and go to 'pill call' to receive his

medication," but Dr. Walsh failed to accommodate him. MTD Opp. at 14; *see also* Complaint ¶

56. However, it is only alleged that this happened one time, and causing a patient to miss a single

dose of medicine does not rise to the level of a constitutional violation. *Cf. Chestnut v. California*

*Dep't of Corr. Parole Outpatient Clinic Serv.*, No. C03-5439VRW(PR), 2004 WL 603503, at *1

(N.D. Cal. Mar. 18, 2004) ("plaintiff's allegations that he received the wrong dose of psychiatric

medication . . . do not amount to more than a claim for negligence and must be dismissed for

failure to state a claim under § 1983").

Delays in treatment can sometimes constitute deliberate indifference. *See Hallett v.*

*Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) ("Prison officials are deliberately indifferent to a

prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical

treatment." (internal quotation marks omitted)); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1123

(9th Cir. 2012) (finding "deliberate indifference in implementing the prescribed treatment" when

"the delay [in treatment] was attributable to [the doctor's] failure to request the referral properly").

Here, delays are alleged with respect to: (3) (relating to delayed blood draws), (4) (relating to a

delayed hospitalization), and (6) (relating to delayed cardiology appointments) could constitute

deliberate indifference on the part of Dr. Walsh.

As to (3), Plaintiffs allege that Dr. Walsh ordered a blood draw in mid-June 2017, but

that—even as of mid-July—it had not been completed. MTD Opp. at 16; *see also* Complaint at ¶

58, 60. However, there is no indication that Dr. Walsh was responsible for the delay. In addition,

where delay is the alleged basis of deliberate indifference, "the delay must have caused substantial

harm." *Wood*, 900 F.2d at 1335 (citing *Shapley*, 766 F.2d at 407). The Complaint does not allege

that the delayed blood draws caused substantial harm to Mr. Lozano.

In allegation (4), Plaintiffs allege that Mr. Lozano reported severe edema—a known

symptom of renal failure—but that Dr. Walsh did not admit him to the hospital until four days

later. MTD Opp. at 16; *see also* Complaint ¶ 78. That followed on the heels of October testing

that revealed that Mr. Lozano "had low levels of $CO_2$ in his blood which can be a sign of kidney

disease," Complaint ¶ 67, and blood work earlier in November that indicated elevated lactate levels, which can also be a sign of kidney disease, *id.* ¶¶ 74–75. In April 2018, Dr. Zhao would report to Mr. Lozano's family that "he ha[d] end stage heart failure complicated by . . . kidney disease." *Id.* ¶ 191. This information could suggest that Mr. Lozano was experiencing serious kidney problems (which ultimately contributed to his death), and that Dr. Walsh delayed four days to get him to the hospital. However, the Complaint does not specifically connect this delay to substantial harm experienced by Mr. Lozano, nor does it indicate that Dr. Walsh was responsible for Mr. Lozano's care during those four days; in fact, the Complaint states that Mr. Lozano was seen by Dr. Leen during that period. *Id.* ¶ 83. In the absence of any assertion that the delay directly contributed to substantial harm experienced by Mr. Lozano or any contention that Dr. Walsh caused the lack of any medical attention during those four days, Dr. Walsh's conduct does not rise to the level of deliberate indifference.

Finally, in allegation (6), Plaintiffs allege that in early 2018, Mr. Lozano informed Dr. Walsh that he was concerned that "his upcoming cardiology appointments [at the Cardiac Device Clinic] had been scheduled on the same days he had court." *Id.* ¶ 111. Dr. Walsh allegedly "emailed the scheduler at VMC to attempt to reschedule around his court dates," *id.*, but after several rounds of scheduling resulting from appointments being made on dates when Mr. Lozano had court, Mr. Lozano was ultimately hospitalized on April 6, *id.* ¶ 147, and "interrogation of Johnny's pacemaker device showed that he had been suffering from persistent atrial fibrillation or arrythmia for the last three days," *id.* ¶ 156. Here, too, there is no indication that Dr. Walsh was responsible for scheduling Mr. Lozano's appointments; he directed the scheduler to make an appointment for Mr. Lozano. There is no allegation Dr. Walsh caused the actual delay and acted with deliberate indifference with respect to Mr. Lozano's cardiology appointments. Nor is there any allegation that Mr. Lozano was substantially harmed as a result of the delay.

As a result, the Court **DISMISSES** Claims One and Two, as against Dr. Walsh. The dismissal is with prejudice.

In addition, as Dr. Walsh's conduct does not rise to the level of deliberate indifference, it cannot be said "shock the conscience," as is required for a violation of substantive due process.

As a result, Claim Three, as against Dr. Walsh is also **DISMISSED** without prejudice.

vi.    <u>Defendant Dr. Nekomoto</u>

The Complaint alleges that Dr. Nekomoto was aware of Mr. Lozano's various diagnoses, but when Mr. Lozano presented with dizziness, Dr. Nekomoto "inquired as to the status of Johnny's criminal case and if he had a release date." Complaint ¶ 55. When Mr. Lozano later presented with a swollen eye (a "secondary sign of heart, liver or kidney failure"), Dr. Nekomoto provided him with only a warm compress and artificial tears. *See* MTD Opp. at 18; *see also* Complaint ¶ 113.

With respect to the dizziness incident, the Complaint does not allege that Dr. Nekomoto failed to treat Mr. Lozano that day. To the contrary, the Complaint alleges that Dr. Nekomoto's records reflect that he spent a lot of time with Mr. Lozano, and that Mr. Lozano "left being appreciative of [Dr. Nekomoto's] help." *Id.* ¶ 55. Thus, the allegations in no way suggest that Dr. Nekomoto purposefully acted or failed to act in a way to address Mr. Lozano's health. Nor is there any allegation that his actions resulted in harm to Mr. Lozano.

With respect to the swollen eye incident, Dr. Nekomoto was aware of Mr. Lozano's diagnoses. MTD Opp. at 18; *see also* Complaint ¶ 30. It is also the case that "[m]acular edema is known to be secondary to congestive heart failure, liver cirrhosis, or renal disease," Complaint ¶ 113, and that within two months of the onset of Mr. Lozano's macular edema he would be experiencing multi-organ failure, *id.* ¶ 180. However, here too, Dr. Nekomoto did respond to Mr. Lozano's symptoms, electing to treat the swelling with a warm compress and artificial tears. Thus, Dr. Nekomoto did not disregard or ignore Mr. Lozano's complaints; he elected to treat his symptoms through methods he determined to be medically appropriate. Accordingly, as with his response to Mr. Lozano's reports of dizziness, even if this conduct were to constitute misdiagnosis, medical malpractice, or gross negligence, it would not rise to the level of deliberate indifference.

As a result, the Court **DISMISSES** Claims One and Two, as against Dr. Nekomoto with prejudice.

In addition, as Dr. Nekomoto's conduct does not rise to the level of deliberate indifference,

United States District Court
Northern District of California

it cannot be said "shock the conscience," as is required for a violation of substantive due process. As a result, Claim Three, as against Dr. Nekomoto is also **DISMISSED** with prejudice.

### vii. Defendant Dr. Kanakaraj

Plaintiffs make several allegations against Dr. Kanakaraj. First, they allege that he was advised that Mr. Lozano should have a follow-up appointment at the medical device clinic in three months, but that no arrangement was made for Mr. Lozano to be seen for seven months. MTD Opp. at 18. Second, they allege that Dr. Kanakaraj refused to dispense the Norco prescribed by the doctors at VMC, and instead gave Mr. Lozano Tylenol. *Id.* Third, they allege that Dr. Kanakaraj downgraded Mr. Lozano from the infirmary to the medical housing unit. *Id.* at 19.

With respect to the delay in returning Mr. Lozano to the medical device clinic, the Complaint does not indicate that Dr. Kanakaraj had any responsibility for scheduling Mr. Lozano's follow-up appointment; there is no indication that his actions caused the delay or that he otherwise bears any responsibility for it.

Dr. Kanakaraj's refusal to dispense Norco does not amount to deliberate indifference; he ordered Tylenol instead. *See, e.g.*, *Fields v. Roberts*, No. 106CV00407AWIYNPPC, 2010 WL 1407679, at *4 (E.D. Cal. Apr. 7, 2010) (finding that denial of requests for pain medication does not constitute deliberate indifference to serious medical needs); *see also George*, 732 F. Supp. 2d at 937 ("a difference in medical opinion does not constitute deliberate indifference"). Finally, nothing in the Complaint indicates why moving Mr. Lozano from the infirmary to the medical housing unit would rise to the level of medical malpractice, gross negligence, or otherwise inadequate care. The exercise of medical judgment does not constitute deliberate indifference.

As a result, the Court **DISMISSES** Claims One and Two, as against Dr. Kanakaraj with prejudice.

In addition, as Dr. Kanakaraj's conduct does not rise to the level of deliberate indifference, it cannot be said "shock the conscience," as is required for a violation of substantive due process. As a result, Claim Three, as against Dr. Kanakaraj is also **DISMISSED** with prejudice.

### viii. Defendant Dr. Zhao

Plaintiffs also make several allegations against Dr. Zhao. First, they contend that Dr. Zhao

told the VMC case manager to hold off on a transfer to Stanford, despite the cardiologist's recommendation and "the fact that she had not even consulted with Stanford yet." MTD Opp. at 19. Second, she never informed Mr. Lozano of the fact that the Stanford doctor she spoke with questioned Mr. Lozano's intellectual capacity and commitment to the transplant process; instead, she relied on that information to conclude that Mr. Lozano was not a transplant candidate. *Id.* Third, Plaintiffs allege that Dr. Zhao never pursued additional treatment for Mr. Lozano, including the implantation of medical devices or additional evaluation at Stanford. *Id.* at 20.

As to the first claim, Dr. Zhao did subsequently speak with doctors at Stanford (perhaps only four hours after telling VMC staff to "hold off" on the transfer to Stanford) and made an informed decision based on the response from a Stanford doctor for refusing to accept Mr. Lozano for several medically related reasons; thus, her decision does not rise to the level of deliberate indifference. *See George*, 732 F. Supp. 2d at 937 ("Deliberate indifference may be inferred when a doctor's treatment decisions are so far afield of accepted professional standards that no inference can be drawn that the decisions were actually based on medical judgment." (internal quotation marks omitted)). *Cf. Pacheco v. Skolnik*, No. 307-CV-00589-HDM-RAM, 2009 WL 2396371, at *5 (D. Nev. July 30, 2009) (find no deliberate indifference where "physician extensively consulted with a . . . specialist"); *see also Thompson v. Ashan*, No. CIV.A. 13-4140 JAP, 2014 WL 809670, at *2 (D.N.J. Feb. 28, 2014) (finding no deliberate indifference where nurse conferred with doctor about course of treatment, but plaintiff did not agree with the diagnosis or lack of follow-up treatment).

With respect to Plaintiffs' second allegation, even if Stanford's decision were premised on incorrect information about Mr. Lozano's intellectual capacity and commitment to the transplant process, to which Mr. Lozano was not given a chance to respond, the complaint does not allege the failure to give Mr. Lozano such opportunity was the result of a purposeful disregard by Dr. Zhao of Mr. Lozano's medical needs, especially in light of her conversation with doctors at Stanford who also indicated Mr. Lozano not only had intellectual limitations, but had previously not been medically compliant. *Cf. Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (if Plaintiff proved that the doctors at his prison facility denied him a kidney transplant "not because of an

1　honest medical judgment, but on account of personal animosity," he would have shown that "the

2　doctors were deliberately indifferent to his serious medical needs.").

3　　　　Finally, the failure to pursue further options at Stanford did not constitute deliberate

4　indifference by Dr. Zhao. She had conferred with other doctors about the appropriate course of

5　treatment. The alternatives (*e.g.*, implantation of a Left Ventricular Assist Device or an intra-

6　aortic balloon pump) were suggested by Dr. Brewster only as possibilities for further evaluation.

7　Her failure to pursue additional alternatives—none of which were obviously indicated in view of

8　Mr. Lozano's advanced disease—was at most medical malpractice or gross negligence. *See*

9　*Thompson*, 6 F. App'x 616. There was no evidence suggesting Dr. Zhao "was motivated by

10　anything other than honest medical judgment." *See Jackson*, 90 F.3d at 332.

11　　　　As a result, the Court **DISMISSES** Claims One and Two, as against Dr. Zhao. The

12　dismissal is with prejudice. In addition, as currently pled, Dr. Zhao's conduct cannot be said

13　"shock the conscience," as is required for a violation of substantive due process. As a result,

14　Claim Three, as against Dr. Zhao is **DISMISSED** with prejudice.

15　　　　　　　　　　　ix.　　Defendant County of Santa Clara

16　　　　Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official

17　policy or custom causes a constitutional tort. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658,

18　690 (1978). To impose municipal liability under § 1983 for a violation of constitutional rights, a

19　plaintiff must show: "(1) that [the plaintiff] possessed a constitutional right of which [he] was

20　deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

21　indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force

22　behind the constitutional violation." *See Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d

23　432, 438 (9th Cir. 1997) (citations and internal quotation marks omitted). For municipal liability,

24　a plaintiff must plead sufficient facts regarding the specific nature of the alleged policy, custom or

25　practice to allow the defendant to effectively defend itself, and these facts must plausibly suggest

26　that the plaintiff is entitled to relief. *See AE v. County of Tulare*, 666 F.3d 631, 636-37 (9th Cir.

27　2012). "[A] 'policy' consists of a 'policy statement, ordinance, regulation, or decision officially

28　adopted and promulgated by that body's officers.'" *Bedford v. City of Hayward*, No. 3:12-CV-

00294-JCS, 2012 WL 4901434, at *12 (N.D. Cal. Oct. 15, 2012) (citing *Monell,* 436 U.S. at 690). "If there is no unconstitutional policy, a municipality can only be liable if there is a widespread practice of unconstitutional conduct which is so permanent and well settled as to constitute a custom or usage." *Id.* at *12 (internal quotation marks omitted) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)); *see also Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995), *as amended on denial of reh'g* (Jan. 12, 1996) (quoting *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir.1992), *cert. denied,* 510 U.S. 932 (1993)) ("a plaintiff may prove 'the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded'"). "In order to withstand a motion to dismiss for failure to state a claim, a *Monell* claim must consist of more than mere formulaic recitations of the existence of unlawful policies, conducts or habits." *Id.*

Plaintiffs argue that they have "alleged dozens of denials and delays of medical treatment during Johnny's incarceration" and that "[t]he entire timeline of alleged events evinces a disturbing pattern of practices establishing a custom." MTD Opp. at 22. Relying on *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792 (9th Cir. 2017), for the proposition that the Ninth Circuit "ha[s] not established what number of similar incidents would be sufficient to constitute a custom or policy," 696 F. App'x at 794, they argue that their allegations here are sufficient to establish a plausible *Monell* claim, MTD Opp. at 22. Because the *Oyenik* court concluded that where the plaintiff had alleged "at least a dozen instances of . . . denying or delaying consultations, biopsies, and radiation treatment for his prostate cancer over the course of almost a year," a reasonable jury could conclude that "such delay tactics amount to a . . . custom or practice of deliberate indifference," *id.* at 794–95 (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)), and because Plaintiffs have similarly "alleged dozens of denials and delays of medical treatment during Johnny's incarceration," Plaintiffs contend that their pleadings are sufficient "to plead a plausible *Monell* claim." MTD Opp. at 22.

However, Plaintiffs' Complaint has not alleged any denial of care adequate to establish a constitutional violation, nor has it alleged delays that would rise to that level. Plaintiff has not identified an official policy or decision crafted by a final policymaking authority; nor has Plaintiff

stated facts sufficient to establish a "widespread" and "well-settled" custom by county officials. *See Bedford*, 2012 WL 4901434, at *13. Aside from making cursory reference to a class action brought against the county regarding inadequate medical care and a "Blue Ribbon Commission" report (that is neither included with nor explained in the Complaint), Plaintiff has not alleged that any other person was subjected to similar treatment. While Plaintiff does allege "dozens of denials and delays of medical treatment," even when taken together, those incidents—as currently alleged—do not evince a well-settled custom on the part of the County. Particularly in light of the progressive nature of Mr. Lozano's illness, the allegations contained in the Complaint do not— again, as currently stated—carry Plaintiffs' claims into the realm of plausibility for a *Monell* claim.

However, were Plaintiffs to explain the widespread nature of the County's conduct in more detail and attribute that to a specific policy, and account for the progressive nature of Mr. Lozano's illness (and counter the argument that his demise was medically inevitable such that the County's actions did not cause his death), the Court finds it possible that a viable *Monell* claim could be made.

Accordingly, the Court **DISMISSES** Claims One, Two, and Three as against the County, but permits leave to amend.

B.     Motion to Strike

Defendants ask the Court to strike:

- Any and all allegations regarding decedent Johnny Lozano, Jr.'s "pain and suffering" in support of plaintiffs' state law claims in violation of Code of Civil Procedure section 377.34 (Complaint ¶¶ 250, 255, 267); and

- Any and all requests for exemplary or punitive damages against defendants Chyorny, Walsh, Nekomoto, Kanakaraj, and Zhao—who are all health care providers—without prior court approval in violation of Code of Civil Procedure section 425.13 (Complaint, ¶¶ 220, 251, 261, 268).

Notice of Motion to Strike at 2, Docket No. 26. As the allegations relating to Mr. Lozano's pain and suffering are contained within Claims Four, Five, and Six, all of which have been dismissed,

Defendants' Motion to Strike as to these allegations is moot, and the Court does not address the merits of the Motion.  Similarly, the requests for exemplary and punitive damages against defendants Chyorny, Walsh, Nekomoto, Kanakaraj, and Zhao stem from Claims Four, Six, and Seven, all of which have been dismissed; thus, Defendants' Motion to Strike as to these allegations is also moot, and the Court need not address the merits of the motion as to these claims either.

## IV.     CONCLUSION

For the foregoing reasons, the Court rules as follows:

- Claims Four and Five are **DISMISSED** without prejudice as to all Defendants;
- Claims Six and Seven are **DISMISSED** with prejudice as to all Defendants;
- Claims One, Two, and Three are:
    - **DISMISSED** with prejudice as to Smith and Beliveau;
    - **DISMISSED** with prejudice as to Dr. Chyorny;
    - **DISMISSED** with prejudice as to Dr. Walsh;
    - **DISMISSED** with prejudice as to Dr. Nekomoto;
    - **DISMISSED** with prejudice as to Dr. Kanakaraj;
    - **DISMISSED** with prejudice as to Dr. Zhao;
    - **DISMISSED** with leave to amend as to the County; Plaintiffs are permitted to file an amended complaint within 30 days of the issuance of this order.
- Defendants' Motion to Strike is mooted by the dismissal of Claims, 4, 5, 6, and 7; therefore, the Court does not address the merits of that motion.

This order disposes of Docket Nos. 25 and 26.

**IT IS SO ORDERED**.

Dated: December 16, 2019

_____
EDWARD M. CHEN
United States District Judge

31